## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SOUTHERN ILLINOIS UNIVERSITY SCHOOL OF MEDICINE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Cause No. 1:18-cv-01092-SEM-TSH |
| U.S. DEPARTMENT OF LABOR, et al., | ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## A. INTRODUCTION

Before the Court is an erroneous ruling that would send shockwaves through the medical community and, specifically, employing hospitals and medical facilities. In measuring pay equality where productivity is at issue, is it indisputable that there would be no actionable disparity if two employees were paid the same compensation rate or formula, for example, based on the same hourly wage or piece-rate. This proposition is in accordance with every applicable federal law. The administrative decision being appealed, however, grossly deviated from this basic legal (and common sense) principle. Instead of focusing on the University's compensation rate, which is the exact same formula for every University physician's clinical compensation, the administrative agency mistakenly looked at end of the year wages and, finding a disparity, arbitrarily awarded over $223,884.27 to Dr. Sajida Ahad ("Dr. Ahad") without regard to Dr. Ahad's lower productivity levels or the fact that Dr. Ahad was the only bariatric surgeon.

By way of background, Dr. Ahad instituted an administrative action against Plaintiff Southern Illinois University School of Medicine (the "University"), her former H-1B employer, for alleged violations of certain wage provisions of the Immigration and Nationality Act (the

"INA") and its implementing regulations. Specifically, Dr. Ahad alleged that the University paid her less wages than physicians during her H-1B period, from July 7, 2011 to July 6, 2014, in violation of the INA. Although physician compensation at the University is based in large part on physician productivity, the Administrative Review Board (the "ARB") of Defendant U.S. Department of Labor ("Department of Labor" or "DOL") improperly found that the INA required the University to provide Dr. Ahad, the sole bariatric surgeon, the same wages the University provided demonstrably more productive physicians, who had other medical specialties, based simply on year-end compensation amounts. This was an error as a matter of law. Employers are only required to offer H-1B workers the same compensation and benefits, on the same basis (*i.e.,* offer the same compensation rate), as other workers, which is exactly what the University did.

For these reasons, and as more fully explained below, the University is entitled to summary judgment, a reversal of the ARB's decision, and a finding that Dr. Ahad was paid the required wage under the INA.

## B.  STATEMENT OF UNDISPUTED MATERIAL FACTS

**The University's Compensation System for Physicians**

*The Compensation Agreement*

1.      The University requires its Assistant Professors with a General Surgery Division appointment to enter into a Compensation Agreement at the outset of their employment. (Declaration "Decl" of Dr. John Mellinger, R-1290-1291, ¶¶ 2-4, Exhibit 1; Deposition of Wendy Cox-Largent, R-1305, Selected Portions, Exhibit  2; DOL's Answer to Plaintiff's First Amended Complaint and Petition for Judicial Review ("Answer"), Dkt No. 17, ¶ 22).

2.      The Compensation Agreement provides for a two-component compensation system for physicians based on:  (1) academic base salary and (2) clinical compensation. (Final Decision

and Order of the ALJ ("ALJ Order"), R-1821, <u>Exhibit</u> 3; ARB Order, R-2322, <u>Exhibit 4</u>; Hearing Transcript, R-1519-1520 , Selected Portions, <u>Exhibit 5</u>;  Cox-Largent Deposition, R-1305, <u>Exhibit 2</u>; Answer, Dkt. No. 17, ¶ 24).

3.     All University physicians received compensation based on the two-component model.  (Dep. of Dr. Ahad, R-694, <u>Exhibit 6</u>).

*Academic Base Salary*

4.     The University utilized industry data of the Association of American Colleges as guidelines to determine academic base salary.  (ALJ Order, R-1822, <u>Exhibit 3</u>; Decl. of Dr. Gary L. Dunnington, R-1263-1264, ¶¶ 10-12, <u>Exhibit 7</u>; Cox-Largent Deposition, R-1314-1316, <u>Exhibit 2</u>).

5.     The salary earned by physicians at the University was based on many factors, including the types of fellowships completed, specific job responsibilities, and specialized knowledge.  (Decl. of Dr. Gary L. Dunnington, R-1263-1264, ¶ 9, <u>Exhibit 7</u>).

6.     At the University, physicians who were members of the trauma and critical care team also received an additional $30,000 to $50,000 per year in academic base salary.   (ALJ Order, R-1821, <u>Exhibit 3</u>; Hearing Transcript, R-1678-1679, <u>Exhibit 5</u>).

7.     At the University, physicians who took trauma call during their employment received higher academic base salaries than physicians who did not.  (Hearing Transcript, R-1629, R-1652, 1695, <u>Exhibit 5</u>).

*Clinical Compensation and Compensation Plan*

8.     The clinical compensation component of a physician's salary is based on a physician's fee-generating productivity.  (ALJ Order, R-1821, <u>Exhibit 3</u>; Hearing Transcript, R-1623-1625, <u>Exhibit 5</u>).

9.      Productivity is determined by the amount of Relative Value Units (RVUs) a physician records in a period.  (ALJ Order, R-1821, Exhibit 3; Compensation Plan, R-0611-628, Exhibit 8; Hearing Transcript, R-1506, Exhibit 5 (Dr. Ahad's counsel: "One obvious event with clinical wages is it's part driven by productivity, or the numbers of surgeries and the numbers of CPT codes for different surgeons medical care activities.")).  The more RVUs a physician generates, the greater the physician's compensation.  (Hearing Transcript, R-1564, R-1624-1625, Exhibit 5).[1]

10.     Every procedure and patient care operation a physician performs is given a certain RVU, which is recorded.  (Hearing Transcript, R-1623-1624, Exhibit 5).  RVUs are based on an operation's complexity and the amount of care required after the operation.  (Hearing Transcript, R-1623-1624, Exhibit 5).

11.     Dr. Ahad admitted that "all surgeons have RVUs."  (Hearing Transcript, R-1562, Exhibit 5).

12.     RVUs are based upon defined "Current Procedural Terminology" ("CPT") codes, which are standards that medical professionals use to document and report medical, surgical, radiology, laboratory, anesthesiology, and evaluation and management services.  (ALJ Order, R-

---

[1] In a recent study, the American Medical Association found that more than half of physicians across the country receive similar compensation based on productivity.  *See*, *Policy Research Perspectives*, How are Physicians Paid? A Detailed Look at the Models Used to Compensate Physicians in Different Practice Types and Specialties, https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/member/health-policy/prp-how-physicians-paid.pdf.  *See also Rodsuwan v. Christus Health N. La.*, 41043 (La. App. 2 Cir 05/17/06) ("Compensation was based on a production standard called the Relative Value Unit or RVU."; *see also* 2005 WI Wrk. Camp. LEXIS 338 ("While Dr. Koski received a draw of $145,000 per year in 1995, again that amount was adjusted periodically to account for the RVUs."); *see also Covenant Healthcare Sys. v. City of Wauwatosa*, 800 N.W.2d 906 ("Under, a variable compensation plan each doctor has the opportunity to make more money by increasing his or her productivity.").

1821, <u>Exhibit 3</u>; Cox-Largent Dep., R-1330, <u>Exhibit 2;</u> Defs.' Answer, Dkt. No 16, ¶ 28 ).[2] CPT

codes vary depending on what type of procedure is being performed. (Dep. of Dr. Ahad, R-0694,

<u>Exhibit 6</u>).

13. The number of RVUs a surgery generates varies significantly depending on medical

specialty or type of surgery. (Dep. of Cox-Largent, R-1330, <u>Exhibit 2</u>; Hearing Transcript, R-

1657, <u>Exhibit 5</u>; Dep. of Dr. Ahad, R-694-695, <u>Exhibit 6</u>).

14. Dr. Ahad admitted that "the more you operate obviously and the more they're able

to collect and give you credit for, the more you will be paid." (Hearing Transcript, R-1564, <u>Exhibit</u>

<u>5</u>).

15. The University determined productivity by the amount of RVUs credited to a

physician during the relative time period. (Defs.' Answer, Dkt. No. 16, ¶ 28).

16. Each Compensation Agreement provides that clinical compensation would be

calculated pursuant to a Compensation Plan, specifically providing in part:

> Member and SIU P&S hereby agree that Member shall be compensated in
> accordance with the SIU P&S Compensation Plan for all services and duties
> performed by Member under the auspices of SIU P&S. …Clinical incentives are
> estimated. Actual amounts will be calculated pursuant to the SIU P&S
> Compensation Plan and are depended on Member's measured productivity and
> availability of funds to SIU P&S.

(Dr. Ahad's Compensation Agreements, R-443-446, <u>Exhibit 9</u>; Defs.' Answer, Dkt. No 16, ¶ 23).

17. The purpose of the Compensation Plan is to further the objectives of the University.

(Compensation Plan, R-0611, <u>Exhibit 8</u>).

---

[2] https://www.aapc.com/resources/medical-coding/cpt.aspx.

18.    The Compensation Plan is designed to ensure that faculty members' compensation determined pursuant to the Plan represents fair and reasonable compensation for the efforts of faculty members.  *Id*.

19.    The Compensation Plan sets forth a formula for calculating the clinical component of physician compensation.  (Compensation Plan, R-0614-0628, <u>Exhibit 8</u>).

20.    According to the Plan, compensation based on RVUs recognizes a physicians' genuine effort.  (Compensation Plan, R-0611, <u>Exhibit 8</u>).

21.    During the first two years of a physician's employment, clinical compensation is guaranteed in the amount of $125,000 to give physicians time to establish a practice.  (ALJ Order, R-1821, <u>Exhibit 3</u>; Hearing Transcript, 1560, <u>Exhibit 5</u>).

22.    After the guarantee period, the University balanced out the amount of RVUs generated versus the amount the physician had been paid.  (ALJ Order, R-1821, <u>Exhibit 3</u>; Hearing Transcript, R-1560-1561, <u>Exhibit 5</u>).   If the physician had not generated sufficient RVUs to cover the amount of guaranteed clinical compensation received, compensation was deducted from a physician's salary to pay the deficit back over time.  *Id*.  Dr. Ahad authorized this deduction from her wages.  (Hearing Transcript, 1561, <u>Exhibit 5</u>).

**<u>Dr. Ahad's Background</u>**

23.    Dr. Ahad is a Pakistani national. (Hearing Transcript, R-1516, <u>Exhibit 5</u>; Defs. Answer, Dkt. No. 17, ¶ 6).

24.    Dr. Ahad attended Aga Khan Medical College in Karachi, Pakistan from 1993 to 1998.  (Hearing Transcript, R-1516, <u>Exhibit 5</u>; Dep. of Dr. Ahad, R-0644, <u>Exhibit 6</u>; Answer, Dkt. No. 17, ¶ 7).

25.    In 2001, Dr. Ahad entered the United States on a J-1 visa to begin a five-year

general surgery residency program at the Mayo Clinic in Rochester, Minnesota.  (Dep. of Dr. Ahad, R-0647-648, <u>Exhibit 6</u>; Answer, Dkt. No. 17, ¶ 8).

26.     Dr. Ahad completed her residency at the Mayo Clinic in 2006.  (Dep. of Dr. Ahad, R-0649-650, <u>Exhibit 6</u>; Answer, Dkt. No. 17, ¶ 9).

27.     In 2006, Dr. Ahad began a two-year minimally invasive surgery fellowship at the University of Washington in Seattle, Washington.  (Dep. of Dr. Ahad, R-650, <u>Exhibit 6</u>; Hearing Transcript, R-1518, <u>Exhibit 5</u>; Answer, Dkt. No. 17, ¶ 10).

**<u>Dr. Ahad's Bariatric Surgery Position at the University</u>**

28.     In 2007, the University advertised an opening specifically for an Academic Bariatric Surgeon position in the Annals of Surgery. (Defs.' Answer, Dkt.. No. 16, ¶ 11)

29.     Dr. Ahad began her employment with the University in July 2008.   (Hearing Transcript, R-1520, <u>Exhibit 5</u>).

30.     According to Dr. Ahad, she "was hired at SIU as a bariatric surgeon."  (Dr. Ahad's Correspondence Regarding Evaluation ("Dr. Ahad Evaluation Correspondence"), R-0485-487, p. 486,  <u>Exhibit 10</u>).

31.     Dr. Ahad was hired by the University to primarily perform bariatric surgeries.  (R-1241).  (Decl. of Dr. Mellinger, R-1241-1243, ¶ 2, November 2015, <u>Exhibit 11</u>).

32.     In her offer letter, Dr. Ahad was told that her "clinical focus will be on the bariatric program and getting a strong laparoscopic program operational."  (Dr. Ahad's Offer Letter ("Offer Letter"), R-0526-529, p. 527, <u>Exhibit 12)</u>.

33.     Dr. Ahad represented to the Illinois Department of Health that it should recommend a J-1 waiver on her behalf because "the Department of Surgery is searching for trained physicians who can offer *expert* care in minimally invasive surgery and Bariatric surgery."  (Dr. Ahad's

Correspondence to the Illinois Department of Health ("Department of Health Correspondent"), R-0601-602, p. 601, Exhibit 13 (emphasis added)).

34.     No other physician at the University primarily performed bariatric surgeries during Dr. Ahad's H-1B period.  (Decl. of Dr. John Mellinger, R-1241-1243, ¶ 2, November 2015, Exhibit 11).

35.     The University offered Dr. Ahad the position primarily because of her completion of the minimally invasive surgery fellowship at the University of Washington.  (Decl. of Dr. Gary Dunnington, R-1263, ¶ 4, Exhibit 7).

36.     During Dr. Ahad's tenure with the University, no other physician had completed a fellowship in minimally invasive surgery. (Decl. of Dr. Gary Dunnington, R-1263, ¶ 6, Exhibit 7); Hearing Transcript, 1596-1597, Exhibit 5).

37.     Upon her hire, Dr. Ahad became the first fellowship-trained bariatric surgeon at the University and remained such during her entire employment with the University.  (Defs.' Answer, Dkt. No. 16, ¶ 17); (Dep. of Dr. Ahad, R-660-661, Exhibit 6; Hearing Transcript, R-1583, Exhibit 5).

38.     Dr. Ahad was also hired to be the Director of the Center of Bariatric Surgery.  (Decl. of Dr. Gary Dunnington, R-1263, ¶ 5, Exhibit 7; Hearing Transcript, R-1585-1586, Exhibit 5; Dep. of Dr. Ahad, R-658-659, 756-757, Exhibit 6).

39.     Dr. Ahad was the only laparoscopic bariatric surgeon while she was at SIU. (Hearing Tr., R-1589, Exhibit 5); Defs.' Answer, Dkt. No. 16, ¶ 17)

40.     During Dr. Ahad's H-1B employment, laparoscopic bariatric surgery was "very new" and "that's why it's important to be fellowship trained as a laparoscopic bariatric surgeon." (Hearing Transcript, R-1714, Exhibit 5).

41.     During Dr. Ahad's H-1B period, 70 percent of Dr. Ahad's surgeries were bariatric surgeries.  (Hearing Transcript, R-1535, Exhibit 5).

42.     The nature of bariatric surgery is that bariatric physicians are not compensated for certain post-operative procedures, although trauma surgeons would be compensated for performing the same post-operative procedures.  (Hearing Transcript, R-1543-1544, Exhibit 5).

43.     During Dr. Ahad's H-1B employment, she did not take trauma call and was never a part of the trauma team.  (Hearing Transcript, R-1522, 1607, 1627, 1651, 1668, 1695, Exhibit 5).

44.     Every surgeon is offered the opportunity to be on the trauma call schedule; it is voluntary except for those trauma and critical care surgeons. (Hearing Transcript, R-1697, 1699, Exhibit 5).

45.     During Dr. Ahad's H-1B employment, Dr. Ahad was asked to begin performing breast surgeries, but she refused to do so.  (Hearing Transcript, R-1572-1573, 1670, Exhibit 5; Dr. Ahad Evaluation Correspondence, R-485-486, Exhibit 10).

46.     The University had a busy breast surgery practice.  (Hearing Transcript, R-1573, Exhibit 5).

47.     Dr. Ahad admitted that the request to take over the breast surgery practice was "to mean [to] change her line of primary surgical focus" and "[c]hange [her] career path."  (Hearing Transcript, R-1573, Exhibit 5).

48.     Dr. Ahad refused to take over the breast surgery practice partly because her J-1 Visa was based on her being a bariatric surgeon.  (Hearing Transcript, R-1574, Exhibit 5; Dr. Ahad Evaluation Correspondence, Exhibit 10).

49.     A decision to take over the breast practice "would have been an opportunity to increase RVU productivity."  (Dr. Ahad Evaluation Correspondence, R-0486, Exhibit 10).

50.     Dr. B (one of the comparators utilized by the ARB), ultimately took on the breast surgery practice.  (Hearing Transcript, R-1573, Exhibit 5).

51.     Although Dr. Ahad's bariatric practice was "very busy," it "didn't show up in numbers because of myriad of reasons."  (Hearing Transcript, R-1573, Exhibit 5).

52.     Dr. Ahad testified that her clinical practice was approximately 60 percent of her time, but 25-30 percent of that time was spent on administrative duties, for example related to the bariatric surgery program at St. John's Hospital.  (Hearing Transcript, R-1529-1530 (Dr. Ahad testifying that such administrative duties "related to patient care, bariatric and patient's part of that program."), Exhibit 5).

53.     Dr.     Ahad     testified     her     teaching     obligation     related     to "bariatric surgery and how to take care of a bariatric patient."  (Hearing Transcript, R-1531, Exhibit 5).

54.     With respect to teaching, Dr. Ahad testified that "[w]e were normally assigned topics that was our *primary area focus*.  So if it was bariatric surgery, I would talk to them about bariatric surgery.  If it was, you know, breast surgery, Dr. Dunnington would be talking to them about breast surgery."  (Hearing Transcript, R-1533 (emphasis added), Exhibit 5).

55.     Dr. Ahad repeatedly testified that "primarily her focus was on bariatric."  Hearing Transcript, R-1534; *see also id.*, R-1533, Exhibit 5).

**The University's Immigration Filings on Behalf of Dr. Ahad.**

56.     On August 17, 2009 the University filed a "PERM" application for Permanent Labor Certification on behalf of Dr. Ahad.  (Application for Permanent Employment Certification ("PERM Application") R-1274-1287, Exhibit 14; Defs' Answer, Dkt. No. 16, ¶ 18).

57.     The PERM application provided that the successful candidate for the position must have completed a fellowship in laparoscopic surgery or laparoscopic bariatric surgery. (Hearing Transcript, 1590, Exhibit 5; PERM Application, R-1276, Exhibit 14; Defs' Answer, Dkt. No. 16, ¶ 18).

58.     On or around June 16, 2010 (before her H-1B employment), Dr. Ahad reviewed the PERM application, verifying under penalty of perjury that Sections J and K are true and correct, and signed it.  (Perm Application, R-1281, Exhibit 14).

59.     In Section K (Job 1), which was her job for the University, the PERM identified the Job Title as Assistant Professor/Baria[tric Surgeon]."[3]  (PERM Application, R-1279, Exhibit 14).

60.     In signing the PERM, Dr. Ahad also "further declare[d] under penalty of perjury that [she] intends to accept the position offered in Section H of this application."  (PERM Application, R-1281, Exhibit 14).

61.     Section H of the PERM (p. 2 of 14) identified the "Job title" as "Assistant Professor of Surgery/Bariatric Surgeon."  (Hearing Transcript, 1586-1587, Exhibit 5; PERM Application, R-1275, Exhibit 14).  Section H (p. 11 of 14) listed the job duties for the position as bariatric surgery.   PERM Application, R-1284, Exhibit 14).

62.     In June 2011, as part of the H-1B process, the University filed a Labor Condition Application on behalf of Dr. Ahad and listed Dr. Ahad's position as "Assistant Professor of Surgery/Bariatric Surgeon."  (Hearing Transcript, 1595, Exhibit 5; Labor Condition Application,

---

[3] The electronic form cut off the complete title due to space limitations.  The Job Details for "Job 1" are spelled out on page 12 of 14 of the form, which repeatedly refer to bariatric surgery and are virtually identical to the job the PERM was filed for, which job duties are identified on page 11 of 14 of the form ("H.11 Job Duties.").

R-772-775, <u>Exhibit 15</u>;  Defs' Answer, Dkt. No. 16, ¶ 19).

63.     The record contains no evidence that Dr. Ahad ever objected to her title as Assistant Professor of Surgery/Bariatric Surgery or that she was paid less in contravention of the INA.  (R-*passim*).

64.     In June 2011, the University submitted a letter to the U.S. Citizenship and Immigration Services ("USCIS") in conjunction with the H-1B petition submitted on Dr. Ahad's behalf, which provided, in part, that Dr. Ahad would be responsible for teaching students "general surgery and bariatric surgery as well as general medical care" in her position as an "Assistant Professor of Surgery/Bariatric Surgeon." (University Correspondence to USCIS, R-631, <u>Exhibit 16</u>); Defs' Answer, Dkt. No. 16, ¶ 19).

65.     Dr. Ahad resigned her position on March 12, 2014.   Hearing Transcript, R-1520, <u>Exhibit 5</u>).

66.     Dr. Ahad was employed by the University in H-1B status from July 7, 2011 until she resigned her position on March 21, 2014.  (Hearing Transcript, R-1520, <u>Exhibit 5</u>); Defs' Answer, Dkt. No. 16, ¶ 21).

67.     After Dr. Ahad's resignation, bariatric patients had to be directed to other medical facilities because there was no longer a skilled bariatric provider at the University.   (Hearing Transcript, R-1677, <u>Exhibit 5</u>).

**<u>Dr. Ahad's Compensation During her Employment at the University</u>**

68.     Dr. Ahad executed compensation agreements with the University on August 10, 2011, July 23, 2012, and August 28, 2013.  (Dr. Ahad's Compensation Agreements, R-443-446, <u>Exhibit 9</u>; Hearing Transcript, R-1563, <u>Exhibit 5</u>).

69.     Dr. Ahad negotiated her salary when she was first hired.  (Hearing Transcript, R-1581, Exhibit 5).

70.     Dr. Ahad's academic base salary was $125,000 throughout the entirety of her employment with the University, and Dr. Ahad admitted that she was paid the $125,000 base salary from her first day of H-1B employment and for her full H-1B employment.   (Hearing Transcript, R-1563, 1566, Exhibit 5).

71.     The clinical compensation component of Dr. Ahad's salary was based on productivity.  ALJ Order, R-1821, Exhibit 3; Dr. Ahad's Clinical Earnings, R-419-437, Exhibit 17).

72.     Dr. Ahad did not take trauma call during her H-1B employment.   (Hearing Transcript, R-1522, Exhibit 5).

73.     In 2011, Dr. Ahad took pregnancy leave from June 15, 2011 to August 10, 2011. (Hearing Transcript, R-1570, Exhibit 5).

74.     In 2011, Dr. Ahad took two weeks and three days of vacation time.  (Hearing Transcript, R-1575, Exhibit 5).

75.     In 2011, Dr. Ahad earned $89,987 in clinical compensation. ALJ Order, R-1820, Exhibit 3; Clinical Compensation Summaries, R-804-807, p. R-804, Exhibit 18).

76.     In Dr. Ahad's 2011 annual evaluation, it was noted that Dr. Ahad was "below her RVU benchmarks." (Dr. Ahad's 2011 Annual Evaluation, R-550-551, p. R-550, Exhibit 19).

77.     In 2012, Dr. Ahad took four weeks of vacation.  (Hearing Transcript, R-1576, Exhibit 5).

78.     In 2012, Dr. Ahad earned $79,138.57 in clinical compensation.   (Clinical Compensation Summaries, R-804-807, p. 805, Exhibit 18).

79.     In Dr. Ahad's 2012 annual evaluation, it was noted that Dr. Ahad's clinical activity had been "generally poor" and that her performance was the lowest in the Division.  *See* Dr. Ahad's 2012 Annual Evaluation, R-547-548, p. R. 547, Exhibit 20).

80.     In 2013, Dr. Ahad earned $110,903.30 in clinical compensation. (Clinical Compensation Summaries, R-804-807, p. 806, Exhibit 18).

81.     In Dr. Ahad's 2013 annual evaluation, it was noted that Dr. Ahad "had fallen short on her RVU benchmarks in a fairly consistent fashion."  *See* Dr. Ahad's 2013 Annual Evaluation, R-542-545, p. 543, Exhibit 21).

82.     From January 2014 until March 21, 2014, Dr. Ahad earned $25,011.50 in clinical compensation.  (Clinical Compensation Summaries, R-804-807, p. 806, Exhibit 18).

83.     At all times during her H-1B employment, Dr. Ahad was offered the same clinical compensation formula as all other surgeons in the General Surgery Division.   (Compensation Plan, 611-628, Exhibit 8).

84.     Dr. Ahad did not earn any RVUs while on vacation.  (Hearing Transcript, R-1584, Exhibit 5).

85.     Dr. Ahad did not earn any RVUs while on pregnancy leave.  (Hearing Transcript, R-1671, Exhibit 5).

**Alleged Comparators Relied on by DOL**

**A.     Dr. A's Background and Employment with the University**

86.     Dr. A specialized in trauma and surgical care during his medical fellowship. (Hearing Transcript, R-1615, 1627, Exhibit 5).

87.     Dr. A began his employment with the University in August 2008.  (Hearing Transcript, R-1616, Exhibit 5).

88.     Dr. A worked at the University as a trauma and critical care surgeon. (Hearing Transcript, R-1542, 1615, 1627, <u>Exhibit 5</u>).

89.     Dr. A did not complete a fellowship, like Dr. Ahad, in minimally invasive surgery. (Hearing Transcript, R-1596-1597, <u>Exhibit 5</u>).

90.     Dr. A never performed any laparoscopic bariatric surgery while Dr. Ahad was employed by the University (Hearing Transcript, R-1628, <u>Exhibit 5</u>).

91.     Performing bariatric surgeries was never part of Dr. A's primary job duties at the University.  (Hearing Transcript, R-1630, <u>Exhibit 5</u>).

92.     Dr. A's job duties included caring for patients that had life threatening illnesses. (Hearing Transcript, R-1630, <u>Exhibit 5</u>).

93.     Dr. A was a member of the trauma team during Dr. Ahad's employment.  (Hearing Transcript, R-1633, <u>Exhibit 5</u>; Deposition of Dr. A, R-1003, Selected Portions, <u>Exhibit 22</u>).

94.     Dr. Ahad admitted that "[m]ost of [Dr. A's] time was spent in non-operative care of the patient" (Hearing Transcript, R-1542-1543, <u>Exhibit 5</u>), which created a difference in pay versus bariatric patients.  (*Id.*, R-1543).

95.     Dr. Ahad testified that "[s]o most bariatric patients would be post-op.  And that basically means that you don't get paid for anything, even if you do deliver the care… .  For three months after you do [bariatric] surgery, you don't get paid for any care you deliver.  Unlike trauma, where just delivering care that normally we are delivering to the bariatric patient, or the general surgery patient, you do get paid."  (Hearing Transcript, R-1543-1544 (Dr. Ahad confirming that surgeons were paid for post-operative trauma care, but not post-operative bariatric care), <u>Exhibit 5</u>).

96.     In 2011, Dr. A earned $146,199.43 in clinical compensation based on his productivity.   ALJ Order, R-1825, <u>Exhibit 3</u>; Clinical Compensation Summaries, R-804-807, p. R-804, <u>Exhibit 18</u>).

97.     In 2012, Dr. A earned $152,415.50 in clinical compensation based on his productivity.   ALJ Order, R-1825, <u>Exhibit 3</u>; Clinical Compensation Summaries, R-804-807, p. R-805, <u>Exhibit 18</u>).

98.     In 2013, Dr. A earned $169,581.98 in clinical compensation based on his productivity.  ALJ Order, R-1825, <u>Exhibit 3</u>; Clinical Compensation Summaries, R-804-807, p. R-806, <u>Exhibit 18</u>).

99.     In 2014, Dr. A earned $145,418.86 in clinical compensation based on his productivity.  ALJ Order, R-1825, <u>Exhibit 3</u>; Clinical Compensation Summaries, R-804-807, p. R-807, <u>Exhibit 18</u>).

**B.      Dr. B's Background and Employment with the University**

100.     Dr. B specialized in transplantation and abdominal transplant surgery during his medical fellowship.  (Hearing Transcript, R-1640, 1649, <u>Exhibit 5</u>).

101.     Dr. B was hired by the University in November 2011. (Hearing Transcript, R-1638, <u>Exhibit 5</u>).

102.     From the time of his hire until July 2012, Dr. B was a transplant surgeon and a general surgeon.  (Hearing Transcript, R-1544, R-1642, <u>Exhibit 5</u>).

103.     Dr. B did not complete a fellowship, like Dr. Ahad, in minimally invasive surgery. (Hearing Transcript, R-1596, <u>Exhibit 5</u>).

104.     During Dr. Ahad's H-1B period, Dr. B did not perform bariatric surgery.  (Hearing Transcript, R-1642, R-1651-1652, <u>Exhibit 5</u>).

105.    Dr. B took trauma call during his employment with the University. (Dep. of Dr. B, R-1120, Selected Portions, <u>Exhibit 23</u>; Hearing Transcript, R-1652, <u>Exhibit 5</u>).

106.    In July 2012, breast surgery became Dr. B's primary area of practice. (Hearing Transcript, R-1573, 1642, <u>Exhibit 5</u>).

107.    After July 2012, breast surgeries accounted for 75 to 80 percent of Dr. B's surgeries. (Hearing Transcript, R-1642-1643, <u>Exhibit 5</u>).

108.    In 2012, Dr. B earned $147,819.92 in clinical compensation based on his productivity. (ALJ Order, R-1825, <u>Exhibit 3</u>; Clinical Compensation Summaries, R-804-807, p. R-805, <u>Exhibit 18</u>).

109.    In 2013, Dr. B earned $193,820.98 in clinical compensation based on his productivity. ALJ Order, R-1825, <u>Exhibit 3</u>; Clinical Compensation Summaries, R-804-807, p. R-806, <u>Exhibit 18</u>).

110.    In 2014, Dr. B earned $182,284.44 in clinical compensation based on his productivity. ALJ Order, R-1825, <u>Exhibit 3</u>; Clinical Compensation Summaries, R-804-807, p. R-807, <u>Exhibit 18</u>).

111.    Dr. B's breast surgery practice became a lucrative part of Dr. B's clinical compensation. (Hearing Transcript, R-1649-1650, <u>Exhibit 5</u>).

112.    Dr. B's clinical compensation increased after he began performing breast surgery. (Hearing Transcript, R-1650, 1658-1659, <u>Exhibit 5</u>; Clinical Compensation Summaries, R-805-807, <u>Exhibit 18</u>).

**C.    <u>Dr. E's Background and Employment with the University</u>**

113.    Dr. E specialized in critical care during his medical fellowship. (Hearing Transcript, R-1721-1722, <u>Exhibit 5</u>).

114. Dr. E was hired by the University in September 2009. (Hearing Transcript, R-1719, Exhibit 5).

115. Dr. E's primary area of practice consisted of trauma, critical care, and general surgery. (Hearing Transcript, R-1546, 1724, Exhibit 5).

116. Dr. E. did not perform bariatric surgery while Dr. Ahad was employed by the University. (Decl. of Dr. Mellinger, R-1241-1243, ¶ 2, November 2015, Exhibit 11).

117. In 2011, Dr. E earned $142,203.14 in clinical compensation based on his productivity. (ALJ Order, R-1825, Exhibit 3; Clinical Compensation Summaries, R-804-807, p. R-804, Exhibit 18).

118. In 2012, Dr. E earned $113,835.73 in clinical compensation based on his productivity. (ALJ Order, R-1825, Exhibit 3; Clinical Compensation Summaries, R-804-807, p. R-805, Exhibit 18).

119. In 2013, Dr. E earned $95,700.26 in clinical compensation based on his productivity. (ALJ Order, R-1825, Exhibit 3; Clinical Compensation Summaries, R-804-807, p. R-806, Exhibit 18).

120. In 2014, Dr. E earned $112,970.14 in clinical compensation based on his productivity. (ALJ Order, R-1825, Exhibit 3; Clinical Compensation Summaries, R-804-807, p. R-807, Exhibit 18).

121. Dr. E's employment with the University ended on June 2, 2015. (Hearing Transcript, 1729, Exhibit 5).

**D.    Dr. I's Background and Employment with the University**

122. Dr. I specialized in surgical oncology during her medical fellowship. (Dr. I's Biography and Compensation Documents, R-403-405, R-451-455, p. 403, Exhibit 24).

123.	Dr. I joined the University in September 2013 as the Director of Gastrointestinal Oncology. (Dr. I's Documents, R-405, Exhibit 24; Dec of John Mellinger, R-1242, Exhibit 11; Hearing Transcript, R-1545, 1673, Exhibit 5).

124.	In 2013 and 2014, Dr. I received the guaranteed amount of $125,000 in clinical compensation under the compensation agreement pursuant to the University's compensation system. (ALJ Order, R-1821, Exhibit 3; Hearing Transcript, 1560, Exhibit 5).

125.	Dr. I did not receive compensation based on productivity during Dr. Ahad's employment. *Id.*

126.	Dr. Ahad admitted that Dr. I's "primary area of focus" was medical oncology and breast surgery. (Hearing Transcript, R-1545, Exhibit 5).

127.	Dr. I did not complete a fellowship, like Dr. Ahad, in minimally invasive surgery. (Hearing Transcript, R-1596, Exhibit 5).

**E.	Dr. K's Background and Employment with the University**

128.	Dr. K is Dr. Ahad's spouse. (Hearing Transcript, R-1540, R-1580, R-1670, Exhibit 5).

129.	Dr. K specialized in colon and rectal surgery during his medical fellowship. (Hearing Transcript, R-1541, R-1578, Exhibit 5).

130.	Dr. K began his employment with the University in July 2006 as a colorectal surgeon. (Decl. of John Mellinger, R-1242, Exhibit 11; Dep. of Dr. K, R-822, Exhibit 25).

131.	Dr. K took trauma call during his employment with the University, and was compensated additionally for doing so. (Hearing Transcript, R-1607, 1670; Dep. of Dr. K, R-829-830, Exhibit 25).

132.	Dr. K was a very busy individual. (Hearing Transcript, R-1670-1671, Exhibit 5).

133.    In 2011, Dr. K earned $196,889.22 in clinical compensation based on his productivity.  (ALJ Order, R-1825, <u>Exhibit 3</u>; Clinical Compensation Summaries, R-804-807, p. R-804, <u>Exhibit 18</u>).

134.    In 2012, Dr. K earned $179,006.77 in clinical compensation based on his productivity.  (ALJ Order, R-1825, <u>Exhibit 3</u>; Clinical Compensation Summaries, R-804-807, p. R-805, <u>Exhibit 18</u>).

135.    Dr. K resigned his employment with the University on April 4, 2013.  (Dep. of Dr. K, R-822, <u>Exhibit 25</u>).

**<u>Dr. Ahad's Complaint to the Wage and Hour Division</u>**

136.    In 2014, Dr. Ahad submitted a complaint to the Wage and Hour Division of the DOL via an ESA Form WH-4 alleging that the University failed to pay her the actual wage for her position as Assistant Professor of Surgery/Bariatric Surgeon during her H-1B employment status. (ALJ Order, R-1816, <u>Exhibit 3</u>).

137.    Dr. Ahad's complaint followed her husband's termination.   (Dep. of Dr. Ahad, R-711-713, <u>Exhibit 6</u>).  Prior to that time, Dr. Ahad had not submitted a formal complaint about her wages. *Id.*

138.    The DOL conducted an H-1B investigation and issued a decision on August 4, 2015.  (ALJ Order, R-1816, <u>Exhibit 3</u>).  In its decision, the DOL determined that the University committed no violation and that Dr. Ahad was properly paid the actual wage for her position.  (ALJ Order, R-1816, <u>Exhibit 3</u>).

**<u>Proceedings Before the Administrative Law Judge</u>**

139.    On August 14, 2015, Dr. Ahad appealed the DOL's decision and requested an administrative hearing.  (ALJ Order, R-1816, <u>Exhibit 3</u>).

140.     The ALJ held a *de novo* formal hearing on January 5, 2016.  (ALJ Order, R-1816-1817, Exhibit 3).

141.     Following the hearing, the ALJ reversed the decision of the Wage and Hour Division and found that the University violated the INA by failing to pay Dr. Ahad the required wage under the INA.  (ALJ Order, R-1815-1834, Exhibit 3).

142.     The ALJ issued an order requiring the University to pay Dr. Ahad back pay in the sum of $223,884.27, which consisted of $80,001.52 for the alleged underpayment of Dr. Ahad's academic base compensation and $143,822.75 for the alleged underpayment of Dr. Ahad's clinical compensation during her H-1B employment.  *Id.*

**Proceedings Before the Administrative Review Board**

143.     The University appealed the ALJ's ruling.  On appeal, the ARB affirmed the ALJ's conclusion that the University failed to pay Dr. Ahad the required wage.  (ARB Decision, R-2319-2326, Exhibit 4).  The ARB affirmed the ALJ's decision in all respects, including the order of $223,884.27 in back pay. *Id.*

## C. ARGUMENT

## I.     THE ARB'S FINAL DECISION IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO THE LAW.

The ARB arbitrarily, and in contravention of the law, found that the INA required the University to provide Dr. Ahad the same compensation as other University physicians, improperly measured by year-end earnings, even though (a) all physicians were offered the same compensation rate, and (b) regardless, other physicians were not similarly situated to Dr. Ahad.

### A.     Standard of Review.

This Court's jurisdiction arises under the Administrative Procedure Act, pursuant to which this Court may generally review "final agency action." *See* 5 U.S.C. § 704 (2006).  The Court may

reverse the Secretary of Labor's decision, announced via the Administrative Review Board, if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law" or if it is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); *e.g.*, *Roadway Exp., Inc. v. U.S. Dep't of Labor*, 612 F.3d 660, 664 (7th Cir. 2010); *Sec'y of Labor of U.S. v. Farino*, 490 F.2d 885, 887–88 (7th Cir. 1973). This Court reviews the agency's legal conclusions *de novo*. *Baiju v. U.S. Dep't of Labor*, 2014 WL 349295, at *8 (E.D.N.Y. Jan. 31, 2014).

The arbitrary and capricious standard "requires the party challenging the agency's action to show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations." *Coal. for Gov't Procurement v. Fed. Prison Indus.*, 365 F.3d 435, 475 (6th Cir. 2004). As the Supreme Court has stated, an agency's action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). With regard to whether a decision was supported by substantial evidence, the Board's decisions must be supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The agency's fact-findings are reviewed under a substantial evidence standard. *Baiju*, 2014 WL 349295, at *8. When a party seeks judicial review of agency action, summary judgment is a proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record *Id.* Because, however, the district court sits as an appellate tribunal in such cases, the usual summary judgment standard under Federal Rule of Civil Procedure 56(c) does not apply. *Id.*

### B. Statutory and Regulatory Framework.

Under the INA, employers may petition the federal government to allow foreign nationals to work in the United States as H–1B nonimmigrant workers in certain specialty occupations typically requiring a bachelor's or higher degree. *Panwar v. Access Therapies*, *Inc.*, 975 F. Supp. 2d 948, 952 (S.D. Ind. 2013). H–1B employers are required to pay H–1B employees the higher of the (a) "actual wage," or (b) the prevailing wage for the specialty occupation as determined by a survey of wages paid to workers similarly employed in the geographic area of intended employment. *Id.* The higher wage is referred to as the "required wage," which must be paid to the H-1B employee for the term of the approved H-1B petition.[4]

The actual wage is the "wage rate" paid by the employer to all other individuals with (1) similar experience and qualifications and (2) for the particular employment position. *Baiju*, 2014 WL 349295, at *1 (citing 20 C.F.R. § 655.731(a)(1)). In determining whether an individual has similar experience and qualifications, the following factors may be considered: "[e]xperience, qualifications, education, job responsibility and function, specialized knowledge, and other legitimate business factors." 20 C.F.R § 655.731(a) (1). To qualify as the "specific employment in question," the jobs under review must "have substantially the same duties and responsibilities." *Id.* Thus, an H-1B employee is entitled to the amount of compensation paid to other employees *only* if (1) there are other employees with substantially similar experience and qualifications *and* (2) those employees work in the specific employment in question. *Id.*[5] In the event that both of

---

[4] Here, the sole issue is whether the University paid Dr. Ahad the "actual wage" during her H-1B employment. The prevailing wage is not at issue.

[5] The ARB in this case determined that the relevant standard is achieved by taking an average of the similarly situated employees. R-1825. The regulation, however, is not clear how this figure is supposed to be calculated, but the regulation is explicit that, "the actual wage

these conditions are not met, "the actual wage shall be the wage paid to the H-1B non-immigrant by the employer." *Id.* Stated differently, if the H-1B employee is the only employee in the position at issue, or even if other employees hold the same position but have different experience and qualifications, the "actual wage" is the amount paid to the H-1B employee.

### C. The Applicable Congressional Intent Further Demonstrates the Agency's Decision is Contrary to the Law.

In interpreting provisions of the INA, courts often look to legislative intent. *See e.g.*, *Prod. Tool Corp. v. Employment & Training Admin.*, *U.S. Dep't of Labor*, 688 F.2d 1161, 1167 (7th Cir. 1982); *Medellin v. Bustos*, 854 F.2d 795, 797 (5th Cir. 1988). In amending certain provisions of the INA in 1998, Congress clearly expressed legislative intent contrary to the ultimate determinations of both the ALJ and the ARB.

As an initial matter, Congress made clear that it "is not aware of all the possible kinds of legitimate salary arrangements that employers may establish … [and] an arrangement that the employer routinely uses with U.S. employees as well as H-1B workers, [] should be treated as ***presumptively*** not a violation" of the INA. *See* 144 Cong. Rec. S12741-04, S12753 (Oct. 21, 1998), 1998 WL 734046 (emphasis added). Notably, Congress made this pronouncement particularly with educational institutions, like the University, in mind. *See id.* Contrary to this clearly expressed legislative intent, the ALJ and, in turn, the ARB, vitiated the University's compensation system based on productivity. In doing so, the ALJ and ARB impermissibly substituted their own judgment with respect to the University's compensation system for the judgment of the University, with dramatic implications for the industry at large.

---

established by the employer is *not* an average of the wage rates paid to all workers employed in the occupation." *See* 20 C.F.R. § 655.715 (emphasis added).

In enacting the American Competiveness and Workforce Improvement Act and amending the INA, Congress expressly stated that its purpose was to "eliminate any ambiguity" as to an H-1B employers' obligations with respect to compensation and benefits. Specifically, Congress stated:

> Clause (viii) adds an additional clarification concerning an employer's obligations under the attestation set forth in 212(n)(1)(A). It states that it is a violation of those obligations for an employer to fail to offer benefits and eligibility for benefits to H-1B workers on the same basis, and in accordance with the same criteria, as the employer offers benefits and eligibility for benefits to U.S. workers. This obligation is only an obligation to make benefits available to an H-1B worker if an employer would make those benefits available to the H-1B worker if he or she were a U.S. worker. Thus, if an employer offers benefits to U.S. workers who hold certain positions, it must offer those same benefits to H-1B workers who hold those positions. Conversely, if an employer does not offer a particular benefit to U.S. workers who hold certain positions, it is not obligated to offer that benefit to an H-1B worker. Similarly, if an employer offers performance-based bonuses to certain categories of U.S. workers, it must give H-1B workers in the same categories the same opportunity to earn such a bonus, although it does not have to give the H-1B worker the actual bonus if the H-1B worker does not earn it.

> ….

> Clause (viii)'s phrasing of the employer's duty as an obligation to provide benefits and eligibility for benefits, rather than just one or the other, was chosen to protect against two eventualities….On the other hand, in order actually to receive many kinds of benefits, employees are frequently required to take some kind of action on their end, whether to select a plan, to provide partial payment for the benefits, to work for the employer for a certain period of time, or to perform at a high level. The actual provision of other kinds of benefits may also turn on other contingencies, such as, in the case of some kinds of bonuses and stock options, the company's year-end performance. Accordingly, the core obligation that makes sense with respect to many benefits is an obligation to make H-1B workers eligible for them. Finally, the obligation is to make the H-1B worker eligible on the same basis, and in accordance with the same criteria as U.S. workers. Thus, in determining whether an employer is meeting this obligation, care must be taken to find the right U.S. worker to whom to compare the H-1B worker in terms of access to benefits.

*Id.*

The University, by way of its uniformly applied compensation system, made Dr. Ahad eligible for the same compensation and benefits, on the same basis, and in accordance with the same criteria, as other physicians. At the outset of Dr. Ahad's employment with the University, Dr. Ahad, like *all* other University physicians, and after negotiation, entered into a compensation agreement that provided for a two-component compensation system—specifically, physicians received (1) an academic base salary for teaching responsibilities and (2) clinical compensation based on a formula that assigns RVUs to the services the physician provided. (SUMF, ¶¶ 1-3; 68-71). Physician compensation necessarily varied by physician as a result of the clinical component which took into account a physician's time devoted to clinical practice, types and amount of procedures performed, specialty, and participation in call schedules, among other things. Simply put, the more productive physicians—physicians that generated a higher number of RVUs—received higher compensation as a result of the University's uniformly-applied compensation system. (SUMF, ¶¶ 8-14).

This is not the case where every U.S. physician at the University received the same clinical compensation and Dr. Ahad received a lesser amount. Rather, every physician's clinical compensation during Dr. Ahad's H-1B period, from July 7, 2011 to July 6, 2014, necessarily varied by year end. (SUMF, ¶¶ 71, 75, 77, 80, 82-83, 96-99; 108-110; 112; 117-120; 124-124; 133-134). However, the **rate or *formula*** for calculating clinical compensation, based on RVUs, was the exact same for each physician over the three-year period per the Compensation Plan applied across the board. (SUMF, ¶¶ 15-22; 83). As demonstrated by the legislative intent, the University was not required to provide Dr. Ahad the same year-end compensation as its other physicians who generated more RVUs than Dr. Ahad. (SUMF, ¶¶ 71, 75, 77, 80, 82-83, 96-99; 108-110; 112; 117-120; 123-124; 133-134). The University was only required to make Dr. Ahad eligible for the

same compensation, and it did so by utilizing the exact same rate or formula to calculate RVUs spelled out in the Compensation Plan as for every physician.  As such, the clearly expressed legislative intent of the INA demonstrates that the decisions of the ALJ and ARB were contrary to the law and arbitrary and capricious.

> **D.    The University's Uniformly Applied Productivity Based Compensation System Does Not Run Afoul of the INA.**

The ARB improperly found that Dr. Ahad's clinical compensation should have been higher simply because other physicians received higher year-end compensation without regard to the very nature of the University's productivity based compensation system and, in doing so, ignored the wage rate (based on RVUs) extended to all physicians.  To be expected (rather than punished) every purported comparator physician received different wages as a result of their productivity; none of the comparators received the same compensation.  *Id*.  Yet, the ALJ calculated the "actual wage" by arbitrarily and impermissibly finding the median of the more productive physicians, and declaring that Dr. Ahad should have been paid that amount.  In doing so, the ALJ and ARB improperly determined that Dr. Ahad's performance and actual hours worked should be ignored in favor of providing Dr. Ahad the same compensation as more productive employees.  In essence, Dr. Ahad received a windfall that is not required by the law.

The ARB's decision to discount the significance of the University's RVU system, which seeks to award genuine effort, in and of itself, requires reversal.  (SUMF, ¶ 20).  The University's Compensation Plan is designed to ensure that faculty members' compensation represents fair and reasonable compensation for the *efforts* of faculty members.   (SUMF, ¶ 18).   In this vein, every procedure and patient care operation a physician performs is given a certain RVU.  (SUMF, ¶ 10). RVUs are based on an operation's complexity and the amount of care required after the operation. *Id*.  The number of RVUs a surgery generates varies significantly according to the surgery.

(SUMF, ¶ 13).  The more patients a physician treats, and the more procedures a physician performs, the greater the number of RVUs generated and, thus, the physician receives greater compensation.  (SUMF ¶¶ 9, 14).  This compensation model and its formula is uniformly applied for every single University physician across medical specialties.[6]

The RVU system is akin to an hourly wage; instead of measuring compensable units by the hours worked, it is measured by RVUs. (The implementing regulations specifically allow pay systems other than a salary basis, for example, piece rate compensation.  20 C.F.R. § 655.731(b)(1)(v)(A)).  In the hourly wage context, although employees will receive by year end varying compensation based on the individual number of hours worked, an employer's obligations under the INA are met as long as employees are paid the same hourly wage rate regardless of whether the year-end compensation is equal.  In this case, all physicians found comparable by the ARB were paid based on the exact same RVU basis and compensation rate (or formula) per the Compensation Plan.  Thus, as required by the INA, the University made Dr. Ahad eligible for the same compensation, on the same basis, and in accordance with the same criteria, as U.S. physicians.  The H-1B laws require no more.  Dr. Ahad does not get to profit because she consistently earned lesser RVUs than other physicians, (SUMF, ¶¶ 72-85), just as an hourly employee who works less hours should not get a windfall to match others who worked more (as long as the employee receives the same hourly wage *rate*).[7]

_____

[6] For these reasons, the ARB also erred in declining to consider the University's argument that certain deductions from Dr. Ahad's salary were authorized, which was a due process violation. The deductions were part of the University's compensation system that was uniformly applied and to which Dr. Ahad agreed.  Indeed, Dr. Ahad negotiated her salary and executed the compensation agreements, which referenced the University's compensation plan.  (SUMF, ¶¶ 69-70).

[7] It is irrelevant *under the H-1B rules* the causes for Dr. Ahad's lower RVUs.  There is one regulatory exception for "benching," which is prohibited by 8 U.S.C. § 1182(n)(2)(C)(vii)(I)-(IV), and is defined as "not performing work and is in a nonproductive status."  20 C.F.R. § 655.731(c)(7).  In this case, however, there was never any allegation that Dr. Ahad was "benched"

Moreover, the INA does not require the University to pay Dr. Ahad the same compensation as more productive physicians merely because of her H-1B status. In effect, the decisions of the ALJ and ARB lead to an absurd result because, following the ALJ's reasoning to its logical conclusion, Dr. Ahad would command a higher compensation solely *because* she is an H-1B employee, which is in direct contravention of the INA's legislative intent and its wage requirements that seek to protect *U.S. workers*. Indeed, the Seventh Circuit has held that the very purpose of the INA is to "protect the domestic labor force from job competition and adverse working conditions as a result of foreign workers entering the labor market." *Prod. Tool Corp. v. Employment & Training Admin.*, *U.S. Dep't of Labor*, 688 F.2d 1161, 1168 (7th Cir. 1982); *see also Medellin v. Bustos*, 854 F.2d 795, 797 (5th Cir. 1988) ("It appears clear that the underlying policy of the Immigration and Nationality Act is, as appellee urges, to exclude aliens competing for American jobs and to protect the American labor market."). Congress sought to prohibit the practice of H-1B workers entering the United States, accepting lower pay from employers, and, thus, resulting in the depression of wages for all workers.

By awarding Dr. Ahad a windfall of compensation artificially "earned" via the ARB's decision, the ARB actually punishes U.S. workers, which contravenes congressional intent, and should be reversed.[8] *Doe v. Reivitz*, 830 F.2d 1441, 1448 (7th Cir. 1987), *amended*, 842 F.2d 194

---

and whether Dr. Ahad was benched (she was not) is not at issue. To rebut Dr. Ahad's contentions otherwise, the University presented evidence that Dr. Ahad received a lower number of RVUs due to leaves of absence, vacations, and her refusal to take on an additional breast surgery practice. (SUMF, ¶¶ 45-51; 73-86). The ALJ and ARB tried to focus blame for Dr. Ahad's lower productivity on the University. However, "blame" is irrelevant for the H-1B purposes absent "benching." The ARB's decision to assess fault misapplied the law and, further, requires reversal.

[8] For instance, Dr. Ahad could command higher compensation than a U.S. physician simply because other, more productive physicians received higher compensation, and in light of the appealed ruling, Dr. Ahad's compensation must be artificially raised to match it. Thus, the ARB's ruling produces a result directly opposite of congressional intent, further exposing its fallacy.

(7th Cir. 1988) (standing for the proposition that if an agency's construction of a statute that it is charged with administering is contrary to clear legislative intent, the court must reject the agency's interpretation.).  This Court should reverse the decisions of the ALJ and ARB and find that Dr. Ahad received the actual wage during her H-1B employment.

## II.    THE ALJ AND ARB ERRED IN DETERMINING THAT OTHER PHYSICIANS WERE PROPER COMPARATORS.

In determining the actual wage for Dr. Ahad's position, the ALJ and ARB erroneously found that certain U.S. physicians had substantially similar duties and responsibilities as Dr. Ahad, which determination is far from being supported by the substantial evidence, is contrary to the law, and is arbitrary and capricious.

The undisputed record evidence demonstrates that the University specifically advertised an opening for an academic bariatric surgeon in 2007.  (SUMF, ¶ 28).  Dr. Ahad was hired specifically to fill this open position and to primarily perform bariatric surgeries.  (SUMF, ¶ 29-33).  The University offered Dr. Ahad the bariatric surgeon position primarily because she completed a minimally invasive surgery fellowship at the University of Washington.  (SUMF, ¶ 35).  Dr. Ahad even represented to the Illinois Department of Health that it was her fellowship training that was being sought as it made her an expert in minimally invasive bariatric surgery. (SUMF, ¶ 33).  This was not mere hyperbole, another physician testified that, indeed, laparoscopic bariatric surgery was a "very new" subspecialty and "that's why it's important to be fellowship trained as a laparoscopic bariatric surgeon."[9]  (SUMF, ¶ 40).  That Dr. Ahad was a laparscopic bariatric surgeon was the *raison d'état* of her hiring and being at the University.

Dr. Ahad was not, as suggested by the ALJ and ARB, hired on or worked as a mere "general

---

[9] The ALJ found all such witnesses credible.  (ALJ Order, R-1817).

surgeon." It was her subspecialty that not only prompted her hiring, but actually defined her work. Dr. Ahad, in fact, referred to her subspecialty in bariatric surgery as her "***primary surgery focus***" and her "***career path***." (SUMF, ¶¶ 32, 47, 54, 55). And this was confirmed by her duties. Indeed, bariatric surgery constituted 70 percent of the surgeries Dr. Ahad performed. (SUMF, ¶ 41). The ALJ's conclusion (adopted by the ARB) that the specific employment in question is a mere "Assistant Professor with an appointment to the Division of General Surgery" discounts her subspecialty entirely, is against the substantial weight of the evidence, and is contrary to the law.

Dr. Ahad's immigration filings further confirm that her focus was bariatric surgery, and the related duties of that subspecialty, not mere general surgery. (SUMF, ¶¶ 56-64). For example, the University's PERM application provided that the successful candidate for Dr. Ahad's position must have completed a fellowship in laparoscopic surgery or laparoscopic bariatric surgery. (SUMF, ¶ 57). On or around June 16, 2010 (***before her H-1B employment***), Dr. Ahad reviewed the PERM application, verifying under penalty of perjury that Sections J and K were true and correct, and signed off on it. (SUMF, ¶¶ 58-61). In Section K (Job 1), which was her job for the University at that moment, the PERM identified the Job Title as Assistant Professor/Bariatric Surgeon. (SUMF, ¶ 59). In signing the PERM, Dr. Ahad also "further declare[d] under penalty of perjury that [she] intends to accept the position offered in Section H of this application." (SUMF, ¶ 60). Section H of the PERM (p. 2 of 14) identified the "Job title" as "Assistant Professor of Surgery/Bariatric Surgeon." (SUMF, ¶¶ 58-61). The Job Details for "Job 1" relating to Section K are spelled out on page 12 of 14 of the form, which repeatedly refer to bariatric surgery and are virtually identical to the job the PERM was filed for, which duties are identified on page 11 of 14 of the form ("H.11 Job Duties."); both of which Dr. Ahad swore under penalty of perjury were true. *Id.*

Further, applicable law provides that the required wage obligation is based on the position identified in the employer's LCA upon which the H-1B status was sought. *See* 20 C.F.R. Section 655.731(c)(8); *see also In Matter of Amtel Group of Florida, Incorporated, Petitioner. v. Rungvichit Yongmahapakorn, Respondent*, 2006 WL 2821406, at *4 (the ARB reversed the ALJ's findings with respect to an H-1B employee's alleged job duties and found that the required wage is based on the occupation listed in the LCA). Here, the LCA listed Dr. Ahad's position as Assistant Professor of Surgery/*Bariatric Surgery* (SUMF, ¶ 62) (emphasis added). Moreover, prior to her resignation, Dr. Ahad never complained that the LCA failed to specify the job she performed accurately or complained that she had not been paid the appropriate wage. (Record, *passim*). Thus, the actual wage must be for a bariatric surgeon, not an "Assistant Professor with an appointment to the Division of General Surgery," as the ALJ and ARB found and which is contrary to applicable law.

Despite the fact that Dr. Ahad was the only bariatric surgeon at the University during her H-1B employment, the ALJ and ARB improperly found that certain physicians were proper comparators and substantially similar to Dr. Ahad. This, too, misapplied applicable law, lacked substantial evidence and was arbitrary and capricious. There was no other employee at the University during Dr. Ahad's H-1B period with similar duties and responsibilities as Dr. Ahad, and, thus, the required wage for Dr. Ahad was the wage she was actually paid.

The differences between Dr. Ahad and the alleged comparators were stark. None of the alleged comparator surgeons performed any bariatric surgeries during Dr. Ahad's H-1B employment. (SUMF, ¶¶ 34, 104, 116, 123 , 126). Moreover, no other physician at the University during Dr. Ahad's H-1B employment had a fellowship in minimally invasive surgery. (SUMF, ¶¶ 35, 36, 90, 104, 117, 128). In fact, after Dr. Ahad resigned her employment in March 2014, her

patients had to be referred to other physicians outside the University because the University no longer had a skilled bariatric provider. (SUMF, ¶ 67). If other surgeons could have performed such surgeries, the procedures would have stayed in-house.

Significantly, Dr. Ahad was never a member of the University's trauma team nor did she take trauma call during her H-1B employment, which not only differentiates her from a comparative standpoint, but also revealed a material distinguishing factor in her income revenue opportunities. (SUMF, ¶ 43-44, 72, 105, 132). Not only did members of the trauma team and those taking trauma call get extra compensation to their academic base (which impacted each of the only comparators Drs. E, I, K, B, and A found by the ARB), but they also experienced more RVU opportunities related to the post-operative care of trauma patients (which Dr. Ahad herself acknowledged). (SUMF, ¶ 42, 51, 95).

And, of course, Dr. Ahad did not share a subspecialty (*i.e.*, which she labelled her "primary focus" and her "career path") with any of the alleged comparators: Dr. A was a trauma and critical care surgeon (SUMF, ¶ 88); Dr. B was hired at the University as a transplant surgeon but transformed his practice into a breast surgery practice[10] (SUMF, ¶¶ 102, 106-107); Dr. E was a trauma and critical care surgeon (SUMF, ¶ 115); Dr. I was the Director of Gastrointestinal Oncology for the University (SUMF, ¶ 123); and Dr. K was a colorectal surgeon (SUMF, ¶ 130). Dr. Ahad was the first fellowship-trained bariatric surgeon at the University and the only bariatric surgeon during her entire H-1B period. (SUMF, ¶ 37). Naturally, procedures in the varied specialties carried different RVU values, and the numbers of procedures would differ from Dr.

---

[10] Dr. Ahad, in fact, declined to take over a breast surgery practice (despite its increased productivity) because that subspecialty would "change" her primary surgical focus and career path, and in such a material way that she believed it would violate J-1 waiver rules. (SUMF ¶¶ 33, 49).

Ahad's practice. (SUMF, ¶¶ 10-13),[11] The supposed comparator physicians all had different fellowships, corresponding with their various subspecialties at the University, did different RVU generating work, all of which confirmed their different roles.

Simply put, Dr. Ahad did not perform work that was substantially similar to that of any of the physicians found to be her comparators and, thus, she did not warrant the same compensation. *See e.g., Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 823 (7th Cir. 2011) ("If cardiologists command a higher market wage than internists, they will be paid more even if the clinic that employs both types of physician regards them as equally valuable."); *Reznick v. Associated Orthopedics & Sports Med., P.A.*, 104 F. App'x 387, 391 (5th Cir. 2004) (finding that two orthopedic surgeons did not perform substantially equal work and were not proper comparators where the male employee "generated nearly twice the amount of revenue as did [the female employee]….[and] [b]ecause [the parties] specialized in different areas of orthopedic medicine, and [the male employee] generated far more revenue for [the hospital] than did [the female employee], the two cannot be said to have held 'substantially equal' positions, so element two of [the plaintiff's] claim fails as a matter of law"); *Beall v. Curtis*, 603 F. Supp. 1563, 1578–79 (M.D. Ga.), *aff'd*, 778 F.2d 791 (11th Cir. 1985) (finding that physicians with different job responsibilities were not substantially equal); *Chiaramonte v. Animal Med. Ctr.*, 2916 WL 299026 at *14 (S.D.N.Y. Jan. 22, 2016) (granting summary judgment and finding that two physicians were

---

[11] Dr. Ahad noted that while her clinical work took up approximately 60 percent of her time, 25-30 percent of that time was spent on administrative duties, for example related to the bariatric surgery program at St. John's Hospital, which did not generate RVUs. (SUMF, ¶ 52). The record does not reflect that the comparators had the same problem.

"not substantially similar in light of the differences in their practices, patient loads, teaching responsibilities, and research contributions.").[12]

Fundamental to the ARB's decision, was the ALJ's conclusion that, merely because the supposed comparators had the same *academic* job titles—namely, Assistant Professor in the General Surgery Division—they necessarily held the exact same position *for H-1B rules*. The relevant test, however, is whether the positions "have substantially the same duties and responsibilities." 20 C.F.R § 655.731(a)(1). Indeed, in a supplementary guide to the implementing regulations, the DOL explicitly advised that "the job title alone is not dispositive" in determining whether an H-1B employee's actual job duties are substantially similar to other employees. *See* Labor Condition Applications and Requirements for Employers Using Aliens on H-1B Visas in Specialty Occupations and as Fashion Models, 57 Fed. Reg. 1316-01, 1992 WL 3062 (Jan. 13, 1992). The supposed comparators and Dr. Ahad were practicing physicians who provided different medical services. (SUMF, ¶¶ 28-56, 89, 103, 107-108, 116, 124, 131). It does not follow that every single practicing physician is similarly situated to every other practicing physician merely because they have similar job ranks, particularly in an academic setting where titles such as Assistant Professor are widely-held. As demonstrated, the alleged comparators, by virtue of their subspecialties, had different duties and responsibilities. Moreover, by law, the operative LCA

_____

[12] The holdings from these cases is not surprising. As this Court has recognized with respect to Dr. Ahad, establishing physician compensation at the University is a highly individualized process. *See e.g.*, *Ahad v. Bd. of Trustees of S. Illinois Univ.*, No. 15-CV-3308, 2018 WL 4350180, at *2 (C.D. Ill. Sept. 12, 2018). This Court, in fact, made a number of findings that support the University's argument here, including: "Defendants typically hire faculty physicians for the purpose of filling a specific sub-specialty need"; physician candidates "negotiate their compensation with the Department Chair"; "The RVUs and, therefore, the clinical compensation, is determined by each individual physician's time devoted to clinical practice, types and amounts of procedures, specialty, and participation in call schedules"; and that Dr. Ahad's primary role "was to develop and lead the Bariatric Surgery Program." (*Id.*, at *3-4).

provides the position definition. The ALJ and ARB deviated from the LCA position definition and, in doing so, violated 20 C.F.R. Section 655.731(c)(8), as explained above.

Because Dr. Ahad was indisputably the only bariatric surgeon employed by the University during her H-1B status, and due to the highly individualized nature of physician compensation, the wage Dr. Ahad was paid was the actual wage for her position. As such, this Court should reverse the findings of the ARB and hold that the University paid Dr. Ahad the required wage for her bariatric surgeon position.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, Plaintiff Southern Illinois University School of Medicine respectfully requests that the Court grant it summary judgment, reverse the Final Order and Decision of the Administrative Review Board, and for such other and further relief as the Court deems appropriate

DATED: March 4, 2019                  Respectfully submitted,

**LEWIS RICE LLC**

By:  /s/ Jerina D. Phillips
     David W. Gearhart, 6274978
     Sarah E. Mullen, 6298585
     Jerina D. Phillips, #65103MO
     600 Washington Ave., Suite 2500
     St. Louis, Missouri 63101
     (314) 444-1302 (telephone)
     (314) 612-1302 (facsimile)
     dgearhart@lewisrice.com
     smullen@lewisrice.com
     jphillips@lewisrice.com

     *Attorneys for Plaintiff Southern Illinois University School of Medicine*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 4, 2019, a copy of the above and foregoing was served via this Court's electronic filing system to all counsel of record.

/s/   Jerina D. Phillips