UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

SOUTHERN ILLINOIS UNIVERSITY
SCHOOL OF MEDICINE,

     Plaintiff,

     v.                             Case No. 1:18-cv-01092-SEM-TSH

UNITED STATES DEPARTMENT OF
LABOR, R. ALEXANDER ACOSTA, in
his official capacity as Secretary of Labor,

     Defendants.

**DEFENDANTS' CONSOLIDATED CROSS-MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................... 4

   I.    Dr. Ahad's Education, Experience, and Visa Status ................................ 4

   II.   SIU's Division of General Surgery.......................................................... 6

   III.  Dr. Ahad's Wages at SIU ...................................................................... 11

   IV.  Dr. Ahad's Work at SIU ........................................................................ 14

   V.   SIU's Impacts on Ahad's Practice and Clinical Compensation........................... 16

   VI.  The Five Comparator Surgeons ............................................................ 22

   VII.  Ahad's Maternity Leave and Vacation ................................................. 26

   VIII. Proceedings Below................................................................................ 27

   IX.  Proceedings in this Court...................................................................... 29

RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS ............................. 30

   I.    Undisputed Material Facts .................................................................... 30

     A.   Undisputed Material Facts Subject to Clarification .............................. 30

   II.   Disputed Material Facts ........................................................................ 35

   III.  Disputed Immaterial Facts.................................................................... 42

   IV.  Undisputed Immaterial Facts ................................................................ 49

   V.   Additional Material Facts ..................................................................... 61

ARGUMENT.......................................................................................................... 61

   I.    STANDARD OF REVIEW .................................................................. 61

   II.   LEGAL FRAMEWORK ....................................................................... 62

   III.  THE ARB AND ALJ REASONABLY CONCLUDED THAT AHAD'S
   EXPERIENCE, QUALIFICATIONS, AND SPECIFIC POSITION WERE
   COMPARABLE TO THOSE OF THE FIVE COMPARATOR SURGEONS. ................. 63

     A.   Actual Wage Comparators' Experience, Qualifications, and Position Need Not
     Be Identical to Those of an H-1B Worker. ...................................................... 64

     B.   Substantial Evidence Supported the Finding that Ahad and the Comparators
     Had Substantially Similar Experience, Qualifications, and Job Responsibilities. .... 66

   IV.  SIU FORFEITED ITS NEW ARGUMENT REGARDING ITS PRODUCTIVITY-
   BASED COMPENSATION SYSTEM BY FAILING TO RAISE IT BELOW. .................. 74

i

V.   SIU FAILED TO PAY AHAD THE ACTUAL WAGE BECAUSE IT DEPRIVED HER OF OPPORTUNITIES TO EARN COMPENSATION.............................................. 76

VI.   DOL'S DECISION IS CONSISTENT WITH LEGISLATIVE INTENT. ............... 82

CONCLUSION ........................................................................................................... 85

CERTIFICATE OF SERVICE .................................................................................. 87

## INTRODUCTION

This case is an Administrative Procedure Act ("APA") challenge to a decision by the United States Department of Labor ("DOL") and its Secretary, R. Alexander Acosta (collectively "Defendants") awarding $223,844.27 in back wages, plus interest, to Dr. Sajida Ahad under the H-1B provisions of the Immigration and Nationality Act ("INA").  From July 2011 to March 2014, Ahad, who was born in Pakistan, worked pursuant to an H-1B visa as an assistant professor and surgeon at Southern Illinois University School of Medicine ("SIU" or "Plaintiff") in its Division of General Surgery. The H-1B provisions enforced by DOL require that employers pay H-1B workers on par with other similarly situated workers.  Specifically, as applied to Ahad's circumstances, the INA and its regulations required that SIU pay her "the actual wage level" that it paid "to all other individuals with similar experience and qualifications for the specific employment in question."

In 2014, Ahad filed a complaint with DOL, alleging that she had been underpaid relative to other comparable employees in SIU's Division of General Surgery.  After an evidentiary hearing and a detailed review of exhibits, an administrative law judge ("ALJ") agreed, concluding that relative to five comparator surgeons, Ahad was underpaid $80,001.52 in academic base compensation and $143,882.75 in pay for her clinical work.  DOL's appellate body, the Administrative Review Board ("ARB"), affirmed the ALJ's conclusions, and SIU is challenging the ARB's decision in this Court.

The Court should reject SIU's challenge.  Substantial evidence supported the ALJ's conclusion, affirmed by the ARB, that the five comparators and Ahad had

1

substantially similar qualifications, experience, and job responsibilities.  All six served as assistant professors within SIU's Division of General Surgery, performing a mixture of academic instruction, research, and clinical work.  All six had 11 to 14 years of training, including a generalized medical school education, a residency in general surgery, and at least one fellowship or training in a specific subspecialty.  All six had minimal, if any, professional experience prior to arriving at SIU.  Although each surgeon specialized to a degree in certain areas, they were all able to work outside their specialties, handle each other's patients, and even change their specialties.  Indeed, Ahad herself, who specialized in laparoscopic bariatric surgery, spent time taking trauma and general surgery call, developed a regular foregut practice, and was even offered an opportunity to take over the breast practice.  SIU's position—that Ahad is comparable only to herself, and that any wage disparities between her and the comparators are therefore irrelevant—is both inconsistent with the H-1B statute and regulations, which require that actual wage comparators have "similar," not identical, experience and qualifications, and unsupported by the record, which demonstrates substantial similarities between Ahad and the comparators in several respects.

The Court should also reject SIU's argument that Ahad was entitled to lower wages because she was less "productive" than others as measured by the revenue she generated for SIU.  As an initial matter, SIU has forfeited the argument it now advances regarding productivity because it failed to raise it before the ALJ or ARB.  While SIU did present an argument related to productivity below, that argument relied on a completely different legal rationale than the one it now presents to this Court.

2

Specifically, SIU argued unsuccessfully below that the H-1B regulations authorized it to "deduct" sums from the required wage otherwise due Ahad because of her lack of productivity.  Here, it instead argues that its compensation system based on productivity is permitted in the first instance because the legislative intent underlying the H-1B statute shows that it need only accord equal treatment to Ahad, not pay her equally.  The Court should reject this fundamentally different argument that SIU never gave Ahad, the ALJ, or the ARB an opportunity to hear.

Even, however, if the Court entertains SIU's newly-advanced argument, that argument should fail.  First, as the ALJ and ARB found, SIU did not provide Ahad with equal treatment, but deprived her of wage-earning opportunities in multiple ways. Ahad's lower revenue generation was attributable not, as SIU implies, to shortcomings in her work, but to a significant lack of support by SIU and its partner hospital, St. John's.  The record evidence demonstrates that SIU and St. John's dissolved the weight management program Ahad had been hired to run, restricted her access to Medicaid and Medicare patients who constituted a significant share of her clients, took away her support staff, failed to adequately publicize her practice, and removed her from the lucrative trauma call schedule.  Ahad's evaluations consistently lauded her work ethic, demeanor, and leadership, nothing that she went above and beyond to seek out ways to generate more revenue despite being placed in circumstances that were "dysfunctional."  Despite this, SIU paid her over $200,000 less than other similarly situated workers at SIU.  By constantly restricting Ahad's opportunities to earn

compensation, which resulted in her earning significantly less than her peers, the university failed to pay her the "actual wage" required by the H-1B statute.

DOL's decision in this case is fully consistent with the purpose of the required wage provisions. It protects American workers by removing an incentive for employers to rely on H-1B workers who are more likely to accept lower pay and less favorable working conditions than American workers would. It is also consistent with the H-1B statute's prohibitions on "benching," which prohibit an employer from paying H-1B workers less than the required wage when the employer's own actions cause such workers to be nonproductive.

For these and other reasons discussed more fully below, DOL's decision was not arbitrary, capricious, or an abuse of discretion, was fully consistent with the H-1B statute and its regulations, and was supported by substantial evidence. This Court should deny SIU's motion for summary judgment, grant Defendants' cross-motion for summary judgment, and dismiss this case with prejudice.

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

**I.      Dr. Ahad's Education, Experience, and Visa Status**

1.      Dr. Sajida Ahad was born in Pakistan, where she attended medical school for five years and received a generalized medical education. R-1516-17.[1]

_____

[1] Citations are to the administrative record filed by Defendants (ECF No. 21-22), using the convention "R-" followed by the page number.

4

2.      After graduating from medical school, in July 2001, Ahad came to the United States and completed a five-year general surgical residency at the Mayo Clinic in Rochester, Minnesota.  R-644, R-745, R-1517.

3.      During her residency, Ahad rotated through different surgical specialties. R-1517.

4.      Following her residency, Ahad completed a two-year fellowship in laparoscopic surgery, also known as minimally invasive surgery, at the University of Washington.  R-1517-18.

5.      Laparoscopic or minimally invasive surgery uses small incisions to address various types of diseases, and can be used in different types of surgeries, including foregut surgery, bariatric surgery, colon surgery, and solid organ surgery.  R-1518.

6.      Of Ahad's twelve years of medical training, only the two years of her fellowship were in a subspecialty of a more specific nature than general surgery; the overwhelming majority of her training was either in general medical education or general surgery.  R-1519.

7.      During her residency and fellowship, Ahad held a J-1 visa, which applies to work- and study-based exchange visitor programs. R-646, 651; 8 U.S.C. 1101(a)(15)(J).

8.      Following the completion of her fellowship, in 2008, Ahad was offered, and accepted, a position at SIU as an Assistant Professor in the Department of Surgery with an appointment to the Division of General Surgery.  R-526-29, R-655, R-1519-20.

9.      Ahad began working at SIU in July 2008.  R-1520.

10.     For her first three years at SIU, Ahad held an O-1 visa, which applies to individuals with extraordinary ability or achievement.  R-514, R-1520, 8 U.S.C. 1101(a)(15)(O).

11.     In June 2011, SIU applied for an H-1B visa for Ahad.  R-630-634.  H-1B visas permit employers to hire nonimmigrants in "specialty occupations" to work in the United States for prescribed periods of time.  *See* 8 U.S.C. 1101(a)(15)(H)(i)(b1); 20 C.F.R. 655.700.

12.     Ahad's H-1B visa was approved for four years, from July 7, 2011 until July 6, 2014.  R-501-02.

13.     Ahad worked in H-1B status at SIU from July 7, 2011 until she resigned on March 21, 2014.  R-1520.

**II.     SIU's Division of General Surgery**

14.     SIU's Division of General Surgery ("the Division") is located within its Department of Surgery.  R-1521-22.

15.     General surgeons typically perform surgery on the abdomen area, as distinguished from, for example, orthopedic surgery or plastic surgery.  *Id.*, R-1600, R-1612, R-1631-32.

16.     During the time relevant to this litigation, surgeons in the Division who were hired immediately after a fellowship were typically hired at the rank of assistant professor.  R-1693-94; *see, e.g.*, R-759-63, R-1521, R-1540, R-1542, R-1544-46.

17.     Assistant professors in the Division did a combination of administrative work, teaching, research, and clinical work (described in their employment agreements as "service").  R-1525-29, R-557-88.

18.     Assistant professors in the Division typically had individual subspecialties.  R-1820.

19.     For example, Ahad specialized in laparoscopic and bariatric surgery.  R-1586.[2]  Her husband, Dr. K, specialized in colorectal surgery.  R-1541.[3]

20.     But the vast majority of the training for surgeons in the Division, including Ahad, was general rather than specialized, and thus prepared them to operate on "anything in the belly." R-1521-22, R-1600, R-1612, *see* chart on R-1823; *see also* R-397-98, R-402-09, R-413-15, R-817, R-820-21, R-854-855, R-1516-18, R-1540-41, R-1544-47, R-1614-15, R-1638-41, R-1720-23.

21.     As such, surgeons within the Division, including assistant professors like Ahad, were not limited to their subspecialties in either their academic or their clinical work.  *See generally* R-1820, R-1824-25.  For example:

---

[2] While not defined in the record, bariatrics is the "branch of medicine concerned with the prevention and control of obesity and allied diseases."  *Stedman's Medical Dictionary* 94900 (2014).

[3] To protect their anonymity, surgeons whose compensation is discussed in this brief are denoted by letter rather than by name.  Their names can be found in the sealed version of the ALJ's Order Concerning Designation of Non-Parties.  R-1738-39.  By agreement of the parties, physicians whose compensation is not discussed in this brief are referenced by their full names.

a.      All assistant professors in the Division performed general surgeries, such as gallbladder surgeries, appendectomies, hernia surgeries, and removing small masses.  R-1535, R-1545-46; *see* R-1617-18.

b.      Although some specialized in trauma and critical care, all surgeons in the Division, upon hiring, were offered the chance to take trauma call because, by virtue of being general surgeons, they were all capable of handling trauma care. R-1524, R-1700.

c.      Surgeons in the Division could "cross over for each other's patients and take care of each other's patients expertly" because their "skill set is very easily transferable." R-1522, R-1600.

d.      Surgeons in the Division also taught courses beyond their subspecialties. R-1532-33.

e.      For example, Ahad taught courses in trauma surgery, foregut surgery, and breast surgery in addition to bariatric surgery.  R-1530-33.

f.      In addition to bariatric surgery, Ahad practiced general surgery, endoscopic surgery, and foregut surgery.  R-1518, R-1535.  In 2013, Ahad began developing a regular foregut practice apart from bariatrics.  R-543.

g.      Ahad took trauma call from 2008 until April or May 2010, and general surgery call beginning in May 2013.  R-670, R-702-03, R-1522-23, R-1607-08.

h.      In 2012, Ahad was asked to take over SIU's breast practice.  R-485-87, R-1264, R-1572-74.

8

i.      Dr. A, who was fellowship trained in trauma and critical care, did general surgery and could take care of anything in the abdomen.  R-1612-13, R-1617-18.

j.      Dr. B, who had a fellowship in transplantation and abdominal transplant surgery, performed "general surgery of many different types," and transplant, breast, kidney, and trauma surgeries.  R-1639-42, R-1098-99.

k.      Despite not being fellowship trained in breast surgery, in July 2012, Dr. B took over the breast practice, and since that date, his primary area of practice has been breast surgery.  R-1642, R-1732.

l.      Even before July 2012, Dr. B did more general surgery than transplant surgery.  R-1642.

m.      Dr. E, who was fellowship trained in critical care, began practicing in that area but shifted to general surgery, focusing specifically on hernia repairs, and, like Ahad, was offered an opportunity to take over the breast practice.  R-1721, R-1727, R-1731.

n.      Dr. K, who was fellowship trained and specialized in colorectal surgery, also took general surgery call and trauma call.  R-829, R-1541, R-1670.

o.      Dr. I had a fellowship in complex general surgery oncology, but also performed breast, pancreas, and hepatobiliary surgeries.  R-403, 1545.

p.      Drs. A, B, and I, as well as Dr. John Sutyak, Dr. John Mellinger, Dr. Marc Garfinkel, Dr. Venkateswara Prasad Poola, and Dr. Jan Rakinic all performed certain laparoscopic procedures, despite not being fellowship trained in that subspecialty.  R-665-667, R-1596-97, R-1656, R-1658, R-1702-03, R-1709.

9

q.      Dr. B, in addition to performing laparoscopic procedures, taught medical students and residents about such procedures.  R-1658.

r.      Dr. Elizabeth Peralta did bariatric surgeries until her departure from SIU in 2011 despite specializing in surgical oncology and not having a bariatric fellowship, R-1242, R-1602, R-1707, R-1712-13.

s.      Dr. Sutyak, who headed the Southern Illinois Trauma Center, also did bariatric surgeries and directed the bariatric program at one of SIU's affiliated hospitals before Ahad's arrival, despite having a research fellowship in immunology.  R-656, R-667, R-676, R-764, R-1602, R-1702-03.

t.      Dr. Mellinger, the Division's chair, described himself, Dr. A, Dr. K, and Dr. Sutyak as capable of assisting in providing bariatric call coverage despite those doctors not being fellowship trained in bariatric or minimally invasive surgery.  R-551, R-665-67, R-821.

u.      Beginning in May 2013, Dr. Mellinger decided that other surgeons in addition to Ahad would, in fact, take bariatric call.  R-702-03.

v.      Surgeons other than Ahad "expertly" handled complications from bariatric surgeries.  R-1599-1600.

22.     Surgeons in the Division also could change their subspecialties.  R-1820. For example,

a.      Dr. E initially focused on trauma surgeries, but later specialized in hernia repairs. R- 1727, R-1731.

b.      As noted above, Ahad and Dr. E were both offered the opportunity to take

over the breast practice despite not having previously specialized in that area.  R-

485-87, R-1264, R-1572-74; R-1730-31.

c.      Dr. B began his career at SIU doing general and transplant surgeries and

then took over the breast practice and focused primarily on breast surgery

beginning in 2012.  R-1640-42, R-1732.

**III.    Dr. Ahad's Wages at SIU**

23.    As part of its application for an H-1B visa for Dr. Ahad, SIU submitted a

Labor Condition Application ("LCA") to DOL.  R-503-507.

24.    The LCA listed the applicable prevailing wage as $130,780 per year, and

neither party below disputed that Ahad was paid the prevailing wage.  R-505, R-1822

n.14.

25.    The LCA listed Ahad's rate of pay as $250,000 per year, as did SIU's I-129

Petition for Nonimmigrant Worker filed with the Department of Homeland Security

("DHS") and a related letter SIU sent to the DHS.  R-505, R-512, R-633.

26.    However, Ahad was not paid a set salary of $250,000 per year.  Rather,

Ahad's salary, and that of most other surgeons at SIU,[4] was divided into two

components – an "academic base," paid by SIU School of Medicine ("SIUSM"), and

"clinical incentives," paid by Southern Illinois University Physicians and Surgeons

---

[4] Surgeons whose academic base was $114,000 or less could receive a "clinical base."  R-615.  Most surgeons whose compensation is documented in the record, including Ahad, earned above $114,000 in academic base and therefore did not receive a clinical base.  R-438-78.

11

("SIUPS"), a "university-related organization" also known as SIU Healthcare.  R-443-446; R-1519-1520, R-1665.[5]

27.     Ahad's "academic base" was guaranteed and totaled $124,999.97 per year during her H-1B employment.  R-710, R-795, R-832, R-1559, R-1593.  She was paid one-twelfth of this amount, or $10,416.66, each month.  R-1819, R-530-36.

28.     Ahad earned $338,789.60 in academic base salary while in H-1B status.  R-1819-20 & n.8, R-1358.[6]

29.     During a surgeon's first two years at SIU, SIU provides surgeons with a set amount of clinical pay, characterized as "guaranteed," to provide time for a surgeon to establish his or her practice.  R-983-84.

30.     However, upon finishing the "guarantee" period, a surgeon must pay back, over the next year, any amount by which the "guaranteed" salary exceeded the amount he or she was deemed to have earned during the "guarantee" period based on

---

[5] During the proceedings below, the wage obligations of SIU School of Medicine and SIUPS were considered collectively given that the two entities were "very closely intertwined."  R-1816 n.1.  No party contested this conclusion.  In this brief, "SIU" is used to refer to both entities collectively.  Where necessary to distinguish between the two entities, "SIUSM" refers to the School of Medicine only, and "SIUPS" is used to refer to Southern Illinois University Physicians and Surgeons only.

[6] As the ALJ explained in a footnote, Ahad's $10,416.66 monthly salary was pro-rated on a per-weekday basis for her two partial months in H-1B status, July 2011 and March 2014.  In July 2011, she worked 17 of 21 weekdays in H-1B status, earning $8,432.53.  In March 2014, she worked 15 of 21 weekdays, earning $7,440.47.  Adding these totals to her salary for two full years and seven full months yields $338,789.60.  *See* R-1819-20 n.8, R-1358.

clinical productivity under SIU's compensation plan, described in further detail below. *Id.*; *see infra* SF 32-34.

31.     Due to this "reconciliation of payment," Dr. Ahad had to pay back amounts following her guarantee period, which occurred from July 2008 to June 2010. R-1560-61.

32.     Beyond this initial two-year period, clinical incentives for Ahad and other physicians at SIU were not guaranteed at all, but were based on the number of relative value units ("RVUs") that the surgeon receives for his or her clinical work.  R-694, R-1329-31, R-1562, R-1623-25.

33.     Each procedure and patient interaction has a specific number of RVUs.  R-1623.

34.     RVUs are then multiplied against a conversion factor, set by SIU, to determine how much clinical pay a surgeon receives.  R-1623-26.

35.     The amount of clinical compensation a surgeon receives depends on a number of factors, including "the number of patients who sought SIU's surgical services, the number of those patients SIU agreed to let [a physician] service, the number of surgeries [the physician] was assigned to perform, the types of surgeries performed, the billing codes (and amounts) that SIU used for various surgical services [the physician] performed, [and] the amounts SIU collected from the patients or insurance companies for the surgeries."  R-105 ¶ 9.

36.     Even if they performed clinical work, surgeons might not be credited with RVUs for reasons out of their control, such as issues collecting payment from insurers

13

or errors in SIU's internal coding and billing practices.  R-492-500, R-1562-63, R-1577. Ahad suffered from such issues during her time at SIU.  *Id.*

37.     In Ahad's 2013 evaluation, Dr. Mellinger specifically noted that SIU shared Ahad's concerns regarding "whether she [was] consistently getting full credit for her entire RVU production" due to "multiple discrepancies in the timely and accurate coding of her procedures."  R-543.

38.     Given the numerous factors and contingencies affecting the amount of clinical compensation a physician could receive, SIU's employment agreements described the "clinical incentives" portion of a physician's salary as "estimated."  R-443-78.

39.     Ahad received a total of $253,676.64 in clinical compensation while she was in H-1B status.  R-1819, R-1820 n.9; R-804-07.[7]

40.     Thus, Ahad earned a total of $592,466.24 ($338,789.60 plus $253,676.64) from SIU while she was in H-1B status.  R-1819; *see* SF 28, 39.

**IV.    Dr. Ahad's Work at SIU**

41.     During her H-1B period, Ahad had the title of Assistant Professor in the Division of General Surgery.  R-572-80, R-1521.

42.     Ahad was expected to spend approximately 30 percent of her time teaching, 10 percent of her time on research, and 60 percent of time doing clinical work,

---

[7] As the ALJ explained, because the record did not include evidence of precisely how Ahad's clinical compensation for 2011 varied by month, he pro-rated her overall clinical compensation for that year, $89,987.84, by calculating a monthly average and then pro-rating it further by day for July 2011.  R-1820 n.9.

also described as "service." *Id.* She testified that these percentages were generally

accurate. R-1529, R-1534.

43. Ahad's academic work included instructing medical students not only in

bariatric surgery, but also in general surgery and general medical care. R-572, R-574, R-

576, R-579.

44. Likewise, her research responsibilities did not specify an area of research

she was to conduct. *Id.*

45. Ahad's primary clinical responsibilities were to "maintain[] a practice of

high quality in general and bariatric surgery" and specifically to "focus . . . on [the

Division's] bariatric program and getting a strong laparoscopic program operational."

R-527, R-573, R-575, R-577, R-580.

46. Her performance reviews consistently praised her efforts to establish that

program, describing them as "fantastic," R-555, "excellent," R-547, and "exemplary," R-

543, stating that she "show[ed] strength in leadership," R-533, and demonstrated

"remarkable administrative skill" in setting up the program at St. John's, R-550.

47. Ahad was also praised for her teaching work, receiving high ratings and

teaching awards. R-550, R-553, R-746.

48. She received particular recognition for her work with a resident who was

struggling academically; her division chair described her efforts as "unparalleled" and

the best he had ever seen in the program. R-550.

49. In her clinical practice, Ahad was "recognized by her colleagues and co-

workers as having exemplary dedication to patient care and relationship skills." R-543.

15

50.     Ahad worked between 60 and 80 hours per week while at SIU.  R-1571.

51.     At no time during her H-1B employment with SIU did Ahad ever decline to perform any services for a patient.  R-1572, R-1607-08.

**V.     SIU's Impacts on Ahad's Practice and Clinical Compensation**

52.     As noted above, Ahad's main clinical focus was to establish a strong laparoscopic bariatric program within the Division.  R-527.

53.     Ahad's clinical work was based at St. John's Hospital, one of two main hospitals in the Springfield, Illinois area.  R-527, R-1714.

54.     SIU does not have its own university hospital, so SIU's doctors work at area hospitals, including St. John's.  R-1717.

55.     Ahad was initially the director of SIU's Comprehensive Obesity Management Program ("COMP"), which was envisioned as a means of providing operative and non-operative solutions for weight management.  R-1589-90, R-1706-07.

56.     However, during the 2009-2010 period, SIU dissolved the COMP program after many of SIU's nurses and physicians left the program and there was not support for moving the program forward.  R-1569-70, R-1589-90, R-1707-08.

57.     There is no evidence in the record that other physicians at SIU had the programs they were hired to staff dissolved.  R-1599, R-1659.

58.     Following the dissolution of the COMP program, Ahad continued her bariatric work through a program in conjunction with St. John's.  R-1590, R-1680-81, R-1707-08.

16

59.     However, during the transition from the COMP program to St. John's, Ahad lost two bariatricians who were associated with the program, and as a result, had to take on all of their non-surgical tasks—work for which she did not receive RVU credit and the associated clinical compensation.  R-1569-70.

60.     Ahad never received funding for a nurse practitioner she was promised upon hiring, had to share a nurse with another doctor, never had a full-time dietitian, and was hindered by constant staff turnover in the bariatric program.  *Id.*

61.     Additionally, in early 2011, SIU and/or St. John's restricted Ahad's access to Medicaid patients.  R-105 ¶ 10, R-485, R-1536-37.

62.     Ahad was significantly affected by this restriction, as Medicaid patients constituted 25 percent of her patients, above the General Surgery Division's average of 15 percent, and Medicaid was her most common payor and, together with Medicare, her "biggest referral source."  R-485, R-553, R-1537.

63.     These restrictions "greatly limited [Ahad's] patient pool," resulting in a "substantial decline" in the number of patients she serviced and a "direct financial hit" to her clinical compensation.  R-485, R-1536-37.

64.     Ahad also was unable to service Medicare patients, apparently at least in part because St. John's Hospital was not designated as a "Center of Excellence" for bariatric surgery.  R-543-44, R-547, R-551, R-555-56.

65.     A "Center of Excellence" designation for a bariatric surgery facility requires that the facility perform a certain number of specific procedures.  R-544, R-551.

17

66.     Ahad was "getting toward [Certificate of Excellence] numbers initially until [St. John's Hospital] stopped [her] from taking Medicaid patients."  R-485.

67.     Thus, not only did St. John's' decision prevent Ahad from seeing Medicaid patients, but the resulting decline in her patient base made it harder for St. John's to obtain "Center of Excellence" designation, which, in turn, prevented Ahad from servicing Medicare patients as well, depriving her of a "very steady stream of patients." R-485, R-543-44, R-547, R-551.

68.     There was no evidence in the record that other physicians were restricted from seeing Medicaid patients.  R-1598-99, R-1659, R-1829.

69.     Ahad's bariatric program also suffered from a lack of marketing support, resulting in her program not being widely known in the community.  R-486, R-1537, R-1689-90.

70.     Due to the lack of support, Ahad had to make her own efforts to market and build the program by traveling outside the immediate area to meet with physicians and give lectures to increase her referral base.  R-543, R-547, R-553, R-1537-38.

71.     Ahad "personally knocked on the doors of practice plans and doctor offices" to introduce herself and her services, but her efforts ultimately could not make up for a lack of "aggressive marketing support from SIU and [St. John's Hospital]."  R-486, R-1537.

72.     Ahad's supervisor, Mellinger, agreed that Ahad's program did not receive a desirable amount of support or promotion, and that these failures "certainly" could have impacted her productivity. R-1689-90.

18

73.     Mellinger noted in his 2012 evaluation of Ahad that "[c]ontracting at St. John's . . . made the [bariatrics] program non-profitable," "prevented a wider marketing and promotion strategy," "hampered" the development of a focused bariatrics program for which Ahad was recruited, and hurt Ahad's clinical productivity. R-547.

74.     Mellinger nonetheless praised Ahad's leadership of the bariatrics program despite the "fairly dysfunctional setting" in which she found herself as a result of factors beyond her control.  R-547.

75.     While Mellinger's 2012 and 2013 evaluations of Ahad noted that she was falling short of her RVU benchmarks, they recognized that this was due in no small part to these constraints on her ability to earn clinical compensation.  R-543, R-547.

76.     Finally, SIU hindered Ahad's ability to earn compensation because it specifically asked her not to take trauma call.  R-1826.

77.     While some of SIU's surgeons were on a designated trauma care team, other general surgeons could participate in trauma call, and SIU's policy was to ask all new hires in the Division if they wanted to be on the trauma call schedule.  R-1523-24, R-1699-1700.

78.     As such, Ahad participated in trauma call from 2008, when she was hired, until April or May 2010.  R-670, R-1522.

79.     Ahad stopped taking trauma call in 2010 because the then-Chair of the Department of Surgery, Dr. Gary Dunnington, asked her to stop doing so.  R-670-71, R-1522, R-1826.

19

80.     This deprived Ahad of a source of income for two reasons:

a.      First, surgeons who were not part of the regular trauma care team but took trauma call earned an additional $3,000-$5,000 in compensation per month. R-1234, R-1652.[8]

b.      Second, physicians who took trauma call could earn additional RVUs, especially because trauma RVUs were generated for all facets of care, including for post-treatment rounds, whereas general surgery RVUs were only generated for the initial evaluation and operation. R-1042-43.

81.     Three years later, in May 2013, Ahad was offered the opportunity to take general surgery call, and accepted in an effort to get more clinical work and generate more RVUs. R-702-03, R-1608, R-1687-88.

82.     However, Ahad's ability to earn more from general surgery call was limited because unlike trauma call, general surgery call is not compensated with a stipend; surgeons only receive RVUs when they do a procedure and bill for it. R-829-830.

83.     Ahad never declined an opportunity for trauma call or general surgery call. R-1607-08.

84.     Ahad also sought to address her shortfall in RVUs by making herself available both as a general surgeon and as a foregut surgeon. R-543, R-547.

---

[8] Similarly, members of the trauma and critical care team received an additional $30,000 to $50,000 per year in academic base salary. R-1678.

85.     Toward the end of her tenure at SIU, Ahad did more general surgery and less bariatric surgery, given the impact of the Medicaid restriction on her bariatric practice.  R-1536-37.

86.     However, it was challenging for Ahad to build up non-bariatric practices given competition from other surgeons.  R-547.

87.     In 2012, Dunnington, who was the head of SIU's breast surgery practice, was preparing to leave SIU, and approached Ahad about taking over the breast practice.  R-1264, R-1572-73.

88.     Ahad responded that it would not have been safe for her to take over the breast practice in addition to her existing labor-intensive, 60-to-80-hours-per-week bariatric practice.  R-1571, R-1573.

89.     During this time, and until May 2013, Ahad, took bariatric call 24 hours a day, 7 days a week.  R-702-03.

90.     In response, Dunnington offered to "kill" SIU's bariatrics program so that Ahad could run the breast surgery practice full-time.  R-485, R-1573-74.

91.     Ahad declined this offer for several reasons.

   a.   First, she had poured significant "sweat and blood" into the bariatrics program and did not want to abandon it.  R-485.

   b.   Second, she was only offered the breast position on a temporary basis until a new breast surgeon was hired.  R-486, R-1573-74.

   c.   Third, and relatedly, the permanent leadership role that Dunnington held in the breast surgery program had already been promised to someone

21

else.  Thus, Ahad was concerned that if the bariatrics program were dissolved, she would be left with no leadership role and diminished job security going forward.  R-486, R-699, R-1574.

    d.  Finally, Ahad was concerned that her visa, which was premised on her work in bariatrics, could have been jeopardized if she were to leave that practice.  R-486, R- 1574.

## VI.  The Five Comparator Surgeons

92.  In his decision below, the ALJ identified five individuals who he determined had similar experience, qualifications, education, job responsibilities and specialized knowledge, in addition to having substantially the same duties and responsibilities, as Ahad.  These individuals (the "Comparators") were Drs. A, B, E, I, and K.  R-1822-25.

93.  Like Ahad, each of the Comparators was an Assistant Professor with an appointment to the Division of General Surgery. R-557-64, R-567-68, R-572-80.

94.  Like Ahad, each of the Comparators had 11 to 14 years of training, including a generalized medical school education lasting 4 to 6 years, a residency in general surgery with rotations through many different subspecialties lasting 5 to 7 years, and one to two fellowships or trainings in a specific surgical subspecialty lasting 1 to 2 years.  *See* chart on R-1823; *see also* R-397-98, R-402-09, R-413-15, R-817, R-820-21, R-854-855, R-1516-18, R-1540-41, R-1544-47, R-1614-15, R-1638-41, R-1720-23.[9]

---

[9] The precise amounts of time Dr. I spent in medical school, residency, and fellowships are not explicitly stated in the record, but appear to be generally consistent with the rest

22

95.     Like Ahad, four of the five Comparators had no previous professional experience (i.e., experience that was not part of medical school, residency or fellowship) before joining SIU.  R-403-05, R-820-22, R-851-52, R-1519, R-1616, R-1723-24.

96.     The fifth Comparator, Dr. B, had only two years of professional experience prior to joining SIU.  R-409.

97.     Like Ahad, each of the Comparators had a subspecialty based on his or her fellowship training, but worked in other areas unrelated to his or her fellowship.  *See* SF 21a-21q, 21t-v.  Some changed their subspecialties.  *See* SF 22.

98.     Like Ahad, each of the Comparators had job responsibilities that included administrative, teaching, research, and "service" or clinical work.  R-557-64, R-567-68, R-572-80.[10]  While the exact percentages differed to a small degree from physician to physician, Ahad and the Comparators were expected to spend between 15 and 30 percent of their time teaching and between 5 and 30 percent of their time doing research.  *Id.*  Service constituted the majority or plurality—either 60 or 45 percent—of their duties.

99.     Surgeries in the operating room constituted only a portion of Ahad and the Comparators' clinical work.  Specifically,

---

of the Comparators based on her completion dates.  R-405.  As to fellowships, while Dr. I held three fellowships that may have lasted up to three years in total, only one of three was in a specific surgical subspecialty, Complex General Surgery Oncology, whereas the other two were in Clinical Medical Ethics and Medical Education.  R-403-05.

[10] Although Ahad's job description, unlike others', did not include administrative duties as a separate category, she estimated that she spent 25 to 30 percent of her time on administrative duties.  R-1529-30.

    a.  Ahad spent about 30 or 40 percent of her patient care time doing surgeries.  R-1538.

    b.  For trauma care, 10 percent of patient care or less was in the operating room, with doctors performing fewer than one trauma surgery per week. R-1524, R-1539, R-1611-12, R-1619, R-1726.

    c.  For general surgery, the percentage of operating room time was higher, about 50 or 60 percent.  R-1539, R-1613.

100.    Thus, for Ahad and the Comparators, surgeries themselves constituted at most about one-third (36 percent, or 60 percent of 60 percent) of their total duties at SIU, and in some cases, far less.  *See* SF 98-99.

101.    Because Ahad and the Comparators worked to some degree outside of their specialties, *see supra* SF 21a-21q, 21t-v, a smaller percentage of their duties consisted of surgeries in their respective specialties.  For example, Ahad estimated that when her bariatric practice was at its height, 30 percent of her surgeries were still non-bariatric, and that percentage increased as her bariatric practice declined due to the inability to serve Medicaid patients.  R-1535-37.  Dr. B, who specialized in breast surgery, estimated that 15 to 20 percent of his surgeries were non-breast.  R-1642-43.

102.    The non-operating room clinical time spent by Ahad and the Comparators included activities such as pre-surgical consultations and discussions with patients, evaluations, pre-operative care, and postsurgical "rounds" (visits/care) with patients. R-1009-10, R-1042-43, R-1101-02, R-1538-39, R-1612.

24

103.    There is no evidence in the record that any of the Comparators were asked to stop taking trauma call.  *See* R-671 (the only physicians Dunnington asked to stop take trauma call were himself, Ahad, and Dr. Peralta).

104.    Despite differences in their subspecialties, from 2011 until 2014, four of the five Comparators received an annual academic base salary of $175,000, while the fifth comparator had an academic base of $72,550.  R-1826 & n.21; *see also* R-1359-61, R-1366, R-1368 (showing academic base salaries for the five Comparators).

105.    Thus, the average of the five Comparators' academic base salaries was $154,510 per year, or a total of $418,791.12 for the entirety of Ahad's H-1B period from July 7, 2011 until she resigned on March 21, 2014.  *See* R-1826 & n.22.[11]

106.    Accordingly, as calculated by the ALJ, Ahad, who received $338,789.60 in academic base during her H-1B period, *see supra* SF 28, earned $80,001.52 less in academic base compensation than one of the Comparators earned on average.  R-1826.

107.    For each year from 2011 to 2014, the average clinical compensation for a Comparator, as calculated by the ALJ, was $161,530.60, $148,269.48, $153,034.41, and $139,329.87, respectively.  *See* chart on R-1825; *see also* R-804-07 (showing clinical compensation for all surgeons in Division of General Surgery from 2011-2014).

---

[11] This incorporates pro-rated amounts for 2011, when Ahad began her H-1B period on July 7, and 2014, when she resigned on March 21.  R-1826 n.22 (explaining calculations).

108.     Thus, as calculated by the ALJ, the average amount of clinical compensation received by a Comparator during Ahad's H-1B period from July 7, 2011 until March 21, 2014 was $411,020.27.  *See* R-1825 & n.20.[12]

109.     Accordingly, as calculated by the ALJ, Ahad, who received $253,676.64 in clinical compensation during her H-1B period, *see supra* SF 39, earned $157,343.63 less in clinical compensation than the average Comparator.  R-1826.

**VII.     Ahad's Maternity Leave and Vacation**

110.     During her H-1B period, Ahad took maternity leave once, for 8 weeks, from June 15, 2011, to August 9, 2011. R-1570.

111.     Ahad was paid her entire academic base by SIUSM during her maternity leave.  R-1358, R-1605.

112.     SIUPS's medical leave policy (which includes leave following the birth of a child) provides for 90 days of maternity leave; the first 30 days are unpaid, while days 31 through 90 are paid at 100 percent of the physician's estimated monthly clinical pay set out in the physician's annual contract, up to six weeks for a vaginal delivery and 8 weeks for a cesarean section.  R-524, R-1334-1335, R-1604-05.

113.     Contrary to this policy, however, SIUPS required Ahad to give up her entitlement to paid maternity leave as a condition of her leave being approved at all, and did not pay her any clinical pay for her maternity leave in 2011.  R-1604-05.

---

[12] As with the academic base, this amount incorporates pro-rated figures for 2011 and 2014.  R-1825 n.20 (explaining calculations).

114.    During her H-1B period from 2011 to 2014, Ahad took a few vacations, including a 3-day trip to Canada to renew her visa and a few longer trips to Pakistan. R-1575.

115.    Each of Ahad's vacations was approved by SIU under its paid vacation policy. R-1575-76.

116.    Under SIU's vacation policy, physicians were paid their academic base from SIUSM while on vacation, but did not receive any clinical compensation from SIUPS because they did not generate any RVUs. R-1575-76, R-1584, R-1672, R-1691.

117.    Ahad did not use all of her available vacation time at SIU, receiving a payout of over $13,000 for unused vacation time when she resigned in 2014. R-541, R-1358, R-1576.[13]

118.    Mellinger, Ahad's supervisor, expressly testified that Ahad did not, to his knowledge, take any more vacation time than other faculty at SIU, and that he was unaware of any instance in which she took more than the allotted number of paid vacation days in a given year. R-1686.

**VIII.  Proceedings Below**

119.    In 2014, Ahad submitted a complaint to DOL's Wage and Hour Division ("WHD"), asserting that SIU failed to pay her the required wage under the H-1B statute and regulations during the time she was employed in H-1B status. R-4-6, R-12-13.

---

[13] The ALJ erroneously stated that Ahad's vacation payout was $7,440.47. R-1831. That amount, as the ALJ correctly noted elsewhere, reflected Ahad's pro-rated academic base for the partial month of March 2014, not her vacation payout. R-1819 n.8.

120.    WHD conducted an investigation and issued a determination on August 4, 2015 that no violation had occurred and that Dr. Ahad was paid the actual wage.  R-18-21.

121.    Pursuant to 29 C.F.R. 655.820, on August 14, 2015, Dr. Ahad sought review of WHD's determination and requested a hearing from an ALJ.  R-14-17.

122.    After discovery and prehearing motions, ALJ Morris D. Davis held an evidentiary hearing on January 5, 2016.  R-1816-17.

123.    On April 13, 2016, the ALJ issued a decision and order in Ahad's favor, finding that SIU had failed to pay Ahad the actual wage as required.  R-1815-34.

124.    Specifically, comparing Ahad's wages to the average wages of the five Comparators during Ahad's H-1B employment (July 7, 2011 until March 21, 2014), the ALJ found that Ahad received $157,343.63 less in clinical compensation and $80,001.52 less in academic base, for a total deficit of $237,345.15.  R-1825-26.

125.    The ALJ further found that consistent with the H-1B regulations and SIU's maternity leave policy, SIU was excused from paying Ahad $13,460.88—the amount the ALJ calculated as the monthly clinical compensation wage component of the actual wage for 2011—for first 30 days of her maternity leave in 2011.  R-1830-31, R-1825 n.20.

126.    Thus, the ALJ reduced the amount of clinical compensation he found SIU owed Ahad by $13,460.88, from $157,343.63 to $143,882.75, and her total compensation owed from $237,345.15 to $223,844.27.  R-1832.

28

127.    The ALJ rejected SIU's argument that its decision to pay Dr. Ahad less money due to lower clinical productivity, as measured by RVUs, could be characterized as a permissible "authorized deduction" under 20 C.F.R. 655.731(c)(9).  R-1827-30.

128.    The ALJ also rejected Dr. Ahad's argument that none of the clinical wages paid by SIUPS could be credited toward the satisfaction of SIU's wage obligation.  R-1826-27.

129.    Accordingly, the ALJ ordered that SIU pay Ahad $223,844.27, consisting of $80,001.52 for the underpayment of academic base compensation and $143,882.75 for the underpayment of clinical compensation, plus prejudgment compound interest on the back pay owed and post-judgment interest until satisfaction in full.  R-1832-33.

130.    Both SIU and Ahad appealed the ALJ's decision to the ARB.  R-1835-43; R-1845-67.

131.    On January 29, 2018, the ARB issued a final decision and order affirming the ALJ's decision in all respects.  R-2319-26.

**IX.    Proceedings in this Court**

132.    On February 28, 2018, SIU filed a Complaint and Petition for Judicial Review in this Court, challenging the ARB's decision.  ECF No. 1.

133.    On July 9, 2018, SIU filed an Amended Complaint and Petition for Judicial Review.  ECF No. 12.

134.    On October 4, 2018, the Court issued a scheduling order, including deadlines for summary judgment motions.  ECF No. 19.

29

135.    On December 10, 2018, Defendants filed the Administrative Record.  ECF No. 21-22.

136.    SIU filed its motion for summary judgment on March 4, 2019.  ECF No. 28.

**RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 7.1(D)(2)(b), Defendants hereby respond to Plaintiff's statement of material facts.  For purposes of this section, any statement that is disputed at least in part will be categorized below as disputed, even if Defendants admit portions of the statement.  If a statement is disputed in part, Defendants have categorized it below as material or immaterial based on the nature of the dispute, regardless of whether the asserted fact itself is material.

**I.    Undisputed Material Facts**

The following numbered facts are conceded to be both undisputed and material:

1, 2, 6, 11, 12, 13, 15, 19, 23, 24, 25, 26, 27, 29, 32, 41, 50, 51, 52, 56, 62, 64, 66, 70, 73, 75, 76, 78, 80, 82, 87, 95, 96, 97, 98, 99, 101, 108, 109, 110, 114, 117, 118, 119, 120, 121, 123, 134, 140, 141, 142, 143.

**A.  Undisputed Material Facts Subject to Clarification**

The following numbered facts are conceded to be both undisputed and material, subject to the following clarifications:

14.    Dr. Ahad admitted that "the more you operate obviously and the more they're able to collect and give you credit for, the more you will be paid." (Hearing Transcript, R-1564, Exhibit 5).

**Response:** Defendants do not dispute this statement with the clarification that it applies to clinical compensation only.

16.     Each Compensation Agreement provides that clinical compensation would be calculated pursuant to a Compensation Plan, specifically providing in part:

> Member and SIU P&S hereby agree that Member shall be compensated in accordance with the SIU P&S Compensation Plan for all services and duties performed by Member under the auspices of SIU P&S. …Clinical incentives are estimated. Actual amounts will be calculated pursuant to the SIU P&S Compensation Plan and are depended on Member's measured productivity and availability of funds to SIU P&S.

(Dr. Ahad's Compensation Agreements, R-443-446, Exhibit 9; Defs.' Answer, Dkt. No 16, ¶ 23).

**Response:** Defendants do not dispute that the substance of each agreement with regard to clinical compensation is essentially the same.  However, the quoted excerpt differs slightly from agreement to agreement.  *Compare*, *e.g.*, R-443 *with* R-451.

20.     According to the Plan, compensation based on RVUs recognizes a physicians' genuine effort. (Compensation Plan, R-0611, Exhibit 8).

**Response:** Defendants do not dispute this statement with the clarification that it is limited to the Plan's representations about RVU-based compensation.  In light of the constraints on Ahad's ability to earn RVUs, *see* SF 52-86, as well as the possibility that a physician might not receive RVU credit despite performing a procedure, *see* SF 36, Defendants would dispute that RVU-based compensation necessarily recognizes a physician's genuine effort.

22.     After the guarantee period, the University balanced out the amount of RVUs generated versus the amount the physician had been paid. (ALJ Order, R-1821, Exhibit 3; Hearing Transcript, R-1560-1561, Exhibit 5). If the physician had not generated sufficient RVUs to cover the amount of guaranteed clinical compensation received, compensation was deducted from a physician's salary to pay the deficit back over time. *Id*. Dr. Ahad authorized this deduction from her wages. (Hearing Transcript, 1561, Exhibit 5).

**Response:** Defendants admit this statement subject to the clarification that the use of the phrase "authorized this deduction" does not imply that such a practice meets the definition of an "authorized deduction" under the H-1B regulations at 20 C.F.R. 655.731(c)(9).

42.     The nature of bariatric surgery is that bariatric physicians are not compensated for certain post-operative procedures, although trauma surgeons would be compensated for performing the same post-operative procedures. (Hearing Transcript, R-1543-1544, Exhibit 5).

**Response:** Defendants do not dispute that surgeons received clinical compensation for post-operative trauma care but not post-operative bariatric care, with the clarification that the cited testimony does not attribute the disparity to "[t]he nature of bariatric surgery;" rather, it appears to be rooted in how the compensation system is designed.

32

43.     During Dr. Ahad's H-1B employment, she did not take trauma call and was never a part of the trauma team. (Hearing Transcript, R-1522, 1607, 1627, 1651, 1668, 1695, Exhibit 5).

**Response:** Defendants do not dispute this subject to the clarification that Ahad was asked to stop taking trauma call in 2010.  R-670-61, R-1522, R-1826.

44.     Every surgeon is offered the opportunity to be on the trauma call schedule; it is voluntary except for those trauma and critical care surgeons. (Hearing Transcript, R-1697, 1699, Exhibit 5).

**Response:** Defendants do not dispute this subject to the clarification that every surgeon is offered this opportunity upon hire, but that Ahad, who initially accepted the offer in 2008, was subsequently asked to stop taking trauma call in 2010.  R-670-61, R-1522, R-1826.

45.     During Dr. Ahad's H-1B employment, Dr. Ahad was asked to begin performing breast surgeries, but she refused to do so. (Hearing Transcript, R-1572-1573, 1670, Exhibit 5; Dr. Ahad Evaluation Correspondence, R-485-486, Exhibit 10).

**Response:** Defendants admit that Ahad declined to perform breast surgeries, with the clarification that she did so for various reasons the ALJ concluded were reasonable.  *See* SF 87-91, R-1831.

71.     The clinical compensation component of Dr. Ahad's salary was based on productivity. ALJ Order, R-1821, Exhibit 3; Dr. Ahad's Clinical Earnings, R-419-437, Exhibit 17).

33

**Response:** Defendants do not dispute this statement with the understanding that "productivity," as used in this context, is defined as the amount of RVUs for which Ahad received credit in the relevant period.  R-1821.

72.    Dr. Ahad did not take trauma call during her H-1B employment. (Hearing Transcript, R-1522, <u>Exhibit 5</u>).

**Response:** Defendants do not dispute this subject to the clarification that Ahad was asked to stop taking trauma call in 2010.  R-670-61, R-1522, R-1826.

79.    In Dr. Ahad's 2012 annual evaluation, it was noted that Dr. Ahad's clinical activity had been "generally poor" and that her performance was the lowest in the Division. *See* Dr. Ahad's 2012 Annual Evaluation, R-547-548, p. R. 547, <u>Exhibit 20</u>).

**Response:** Defendants do not dispute that the evaluation includes this statement, except to clarify that the "performance" referenced is "benchmark performance" "[w]ith regard to clinical activity" only, rather than Ahad's an evaluation of all of Ahad's duties at SIU.  R-547.

81.    In Dr. Ahad's 2013 annual evaluation, it was noted that Dr. Ahad "had fallen short on her RVU benchmarks in a fairly consistent fashion." *See* Dr. Ahad's 2013 Annual Evaluation, R-542-545, p. 543, <u>Exhibit 21</u>).

**Response:** Defendants do not dispute that the evaluation includes this statement, but note that the evaluation also states that "there are months when she clearly is on target to meet [her RVU benchmarks]," R-543, and notes several mitigating factors affecting Ahad's RVU production.  *See* SF 75.

II.      **Disputed Material Facts**

4.      The University utilized industry data of the Association of American

Colleges as guidelines to determine academic base salary. (ALJ Order, R-1822, Exhibit 3;

Decl. of Dr. Gary L. Dunnington, R-1263-1264, ¶¶ 10-12, Exhibit 7; Cox-Largent

Deposition, R-1314-1316, Exhibit 2).

**Response:** Notwithstanding testimony by SIU witnesses that the University used

Association of American Medical Colleges ("AAMC") data as a guideline, the ALJ

found only that such data "may have served as a basis of discussion for salary

negotiations" at SIU, given that Comparators Drs. A, B, E, and I "received the exact

same academic base salary despite completing different fellowships and having

different specialties" and despite the fact that the AAMC tables listed different salaries

for their respective subspecialties.  R-1824; *see* R-1359-60, R-1366, R-1368, R-1440-41.

5.      The salary earned by physicians at the University was based on many

factors, including the types of fellowships completed, specific job responsibilities, and

specialized knowledge. (Decl. of Dr. Gary L. Dunnington, R-1263-1264, ¶ 9, Exhibit 7).

**Response:** While this statement accurately describes what Dr. Dunnington

asserted in his Declaration, as noted above in the response to Plaintiff's Statement of

Fact 4, the ALJ found that four of the five comparators received the exact same

academic base salary despite different fellowships and subspecialties.  R-1824.

9.      Productivity is determined by the amount of Relative Value Units (RVUs)

a physician records in a period. (ALJ Order, R-1821, Exhibit 3; Compensation Plan, R-

0611-628, Exhibit 8; Hearing Transcript, R-1506, Exhibit 5 (Dr. Ahad's counsel: "One

obvious event with clinical wages is it's part driven by productivity, or the numbers of

surgeries and the numbers of CPT codes for different surgeons medical care

activities.")). The more RVUs a physician generates, the greater the physician's

compensation. (Hearing Transcript, R-1564, R-1624-1625, Exhibit 5) (footnote omitted).

**Response:** Defendants do not dispute that the University determined clinical

productivity by the amount of RVUs recorded in a period or that in general, physicians

who generated more RVUs earned more clinical compensation. That said, this was not

necessarily always the case given that problems in bill collection or coding errors

sometimes prevented physicians, including Ahad, from receiving full credit for their

RVU production.  *See* SF 36.

Defendants also object to Plaintiff's citation in a footnote of a recent study by the

American Medical Association, as it is outside the administrative record, and this

Court's review in an Administrative Procedure Act action is confined to the

administrative record.  *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068,

1081 (7th Cir. 2016).

10.     Every procedure and patient care operation a physician performs is given

a certain RVU, which is recorded. (Hearing Transcript, R-1623-1624, Exhibit 5). RVUs

are based on an operation's complexity and the amount of care required after the

operation. (Hearing Transcript, R-1623-1624, Exhibit 5).

**Response:** Defendants dispute the portion of this statement that states that RVUs

are "recorded," to the extent that it suggests that RVUs for procedures and patient care

operations are always recorded accurately.  In fact, problems in bill collection or coding

36

errors sometimes prevented physicians, including Ahad, from receiving full credit for their RVU production.  *See* SF 36.

21.    During the first two years of a physician's employment, clinical compensation is guaranteed in the amount of $125,000 to give physicians time to establish a practice. (ALJ Order, R-1821, Exhibit 3; Hearing Transcript, 1560, Exhibit 5).

**Response:** Defendants do not dispute that physicians received a certain amount, which SIU characterized as "guaranteed," for the first two years of their employment to give them time establish a practice, or that Ahad received $125,000 per year during this time period.  However, the guarantee amount was not $125,000 for all physicians; rather, it reflected each physician's estimated clinical compensation.  Dr. K received a guarantee of $159,500 per year in clinical compensation during his first two years.  R-825-26.  Dr. T received a guarantee of $150,000 per year.  R-913-14.  Dr. A received a guarantee of $150,000 per year.  R-1619-22.  Dr. B received a guarantee of $100,000 per year.  R-1643-44.  Additionally, Defendants dispute the characterization of such compensation as "guaranteed" given that at the end of the period, physicians had to pay money back to SIU if they did not earn enough RVUs to cover the amount of "guaranteed" clinical compensation.  R-984, R-1560-61.

31.    Dr. Ahad was hired by the University to primarily perform bariatric surgeries. (R- 1241). (Decl. of Dr. Mellinger, R-1241-1243, ¶ 2, November 2015, Exhibit 11).

**Response:** Dr. Ahad's job description included three components: teaching, research, and "service" or clinical work.  R-572-80.  Clinical work constituted 60 percent

of her duties.  *Id.*  Of her clinical work, only 30 to 40 percent of her time was spent in the operating room performing surgeries, of which 70 percent were bariatric.  R-1535-38. Thus, Dr. Ahad spent only 13 to 17 of her time at SIU (60 percent x 30-40 percent x 70 percent) actually performing bariatric surgeries.  Accordingly, although Defendants do not dispute that of the surgeries she was hired, in part, to perform, Ahad was expected to focus primarily on bariatric surgeries, she was not hired "to primarily perform bariatric surgeries."  Defendants also note that by the end of her time at SIU, she was performing less bariatric surgery and more general surgery.  *See* SF 85.

49.     A decision to take over the breast practice "would have been an opportunity to increase RVU productivity." (Dr. Ahad Evaluation Correspondence, R-0486, Exhibit 10).

**Response:** While Defendants do not dispute that Ahad characterized a potential decision to take over the breast practice as an opportunity to increase RVU productivity, given that in the same document she expressed concern that her position as a breast surgeon would not be "guaranteed or secure," this characterization should be understood to apply to the short-term only.  R-486.

53.     Dr. Ahad testified her teaching obligation related to "bariatric surgery and how to take care of a bariatric patient." (Hearing Transcript, R-1531, Exhibit 5).

**Response:** Ahad testified that teaching bariatric surgery and care was part of her teaching obligation.  She also testified that she taught trauma surgery, foregut surgery, and breast surgery.  R-1530-33.

38

65.     Dr. Ahad resigned her position on March 12, 2014. Hearing Transcript, R-1520, Exhibit 5).

**Response:** Ahad resigned on March 21, 2014.  R-1520.

67.     After Dr. Ahad's resignation, bariatric patients had to be directed to other medical facilities because there was no longer a skilled bariatric provider at the University. (Hearing Transcript, R-1677, Exhibit 5).

**Response:** Defendants do not dispute that Dr. Mellinger testified to this effect; however, his testimony that there was no longer a "skilled bariatric provider" at the University after Ahad resigned is inconsistent with the fact that (1) Dr. John Sutyak, who had headed the Comprehensive Obesity Management Program before Ahad's arrival and had previously performed bariatric surgeries at SIU, R-1705-06, was employed by the University, and (2) Dr. T, who was fellowship trained in minimally invasive surgery and bariatric surgery, began work at SIU on August 3, 2014, shortly after Ahad's resignation, R-876, R-879.

88.     Dr. A worked at the University as a trauma and critical care surgeon. (Hearing Transcript, R-1542, 1615, 1627, Exhibit 5).

**Response:** Defendants dispute the characterization of Dr. A as a "trauma and critical care surgeon."  While Dr. A subspecialized in trauma and critical care, he also did general surgery and could take care of anything in the abdomen.  R-1612-13, R-1617-18.

94.     Dr. Ahad admitted that "[m]ost of [Dr. A's] time was spent in non-operative care of the patient" (Hearing Transcript, R-1542-1543, Exhibit 5), which created a difference in pay versus bariatric patients. (*Id.*, R-1543).

**Response:** Defendants do not dispute the accuracy of the quote or that most of Dr. A's time was spent in non-operative patient care.  However, the difference in pay for bariatric and trauma patients was not because most of trauma care was non-operative care, but because post-operative trauma care was compensated with RVUs, whereas post-operative bariatric care was not.  *See* Pl.'s SF 95.

102.    From the time of his hire until July 2012, Dr. B was a transplant surgeon and a general surgeon. (Hearing Transcript, R-1544, R-1642, Exhibit 5).

**Response:** Defendants dispute the characterization of Dr. B as a "transplant surgeon and a general surgeon."  In the second of the two cited pages, Dr. B testified that from the time of his hire to July 2012, "the bulk of [his] practice," not the entirety thereof, was general surgery and transplant surgery, focusing more on general surgery.

115.    Dr. E's primary area of practice consisted of trauma, critical care, and general surgery. (Hearing Transcript, R-1546, 1724, Exhibit 5).

**Response:** Defendants dispute that Dr. E had one "primary area of practice" during his tenure at SIU.  Rather, he began focusing on trauma and critical care but shifted to general surgery, focusing specifically on hernia repairs.  R-1727, R-1731.

124.    In 2013 and 2014, Dr. I received the guaranteed amount of $125,000 in clinical compensation under the compensation agreement pursuant to the University's

compensation system. (ALJ Order, R-1821, <u>Exhibit 3</u>; Hearing Transcript, 1560, <u>Exhibit 5</u>).

**Response:** The cited pages do not support this assertion.  The record indicates that Dr. I, who joined SIU in September 2013, received $26,755.96 in clinical compensation in 2013 and $116,646.04 in clinical compensation in 2014.  R-806-807.  The record contains no evidence as to whether Dr. I accepted guaranteed clinical compensation for either of her first two years at SIU.

125.    Dr. I did not receive compensation based on productivity during Dr. Ahad's employment. *Id*.

**Response:** The cited pages do not support this assertion or reference Dr. I at all.

130.    Dr. K began his employment with the University in July 2006 as a colorectal surgeon. (Decl. of John Mellinger, R-1242, <u>Exhibit 11</u>; Dep. of Dr. K, R-822, <u>Exhibit 25</u>).

**Response:** The cited page of Dr. K's testimony indicates that he believes he began his employment at SIU in October 2006, not July.  Additionally, Defendants dispute the characterization of Dr. K as a "colorectal surgeon."  While Dr. K specialized in colorectal surgery, his job title, like the other Comparators, was Assistant Professor with an appointment to the Division of General Surgery, and he also took trauma call and general surgery call and practiced general surgery.  *See* R-557, SF 21n.

133.    In 2011, Dr. K earned $196,889.22 in clinical compensation based on his productivity. (ALJ Order, R-1825, <u>Exhibit 3</u>; Clinical Compensation Summaries, R-804-807, p. R-804, <u>Exhibit 18</u>).

41

**Response:** According to the cited pages, in 2011, Dr. K earned $196,189.22 in clinical productivity, not $196,889.22.  R-804, R-1825.

138.    The DOL conducted an H-1B investigation and issued a decision on August 4, 2015. (ALJ Order, R-1816, <u>Exhibit 3</u>). In its decision, the DOL determined that the University committed no violation and that Dr. Ahad was properly paid the actual wage for her position. (ALJ Order, R-1816, <u>Exhibit 3</u>).

**Response:** Defendants dispute the characterization of the investigation and determination as one by DOL.  The investigation and determination were completed by WHD, a component of DOL.  The entity with authority to issue final decisions on DOL's behalf, the ARB, affirmed the ALJ's reversal of WHD's determination.  R-2319-26.

139.    On August 14, 2015, Dr. Ahad appealed the DOL's decision and requested an administrative hearing. (ALJ Order, R-1816, <u>Exhibit 3</u>).

**Response:** Defendants dispute the characterization of the investigation and determination as one by DOL.  The investigation and determination were completed by WHD, a component of DOL.  The entity with authority to issue final decisions on DOL's behalf, the ARB, affirmed the ALJ's reversal of WHD's determination.  R-2319-26.

### III.    Disputed Immaterial Facts

7.    At the University, physicians who took trauma call during their employment received higher academic base salaries than physicians who did not. (Hearing Transcript, R-1629, R-1652, 1695, <u>Exhibit 5</u>).

**Response:** Defendants do not dispute that physicians who were members of the trauma and critical care team received an additional $30,000 to $50,000 per year in

academic base salary.  R-1678.  Nor do Defendants dispute that physicians who took trauma call, but were not part of the trauma and critical care team, received a stipend of $3,000 to $5,000 per month.  R-1234, R-1652.  However, it is unclear from the record whether this latter monthly stipend was incorporated into physicians' academic base or clinical pay.  Defendants do not believe that this dispute is material, as Defendants do not dispute the amount of the monthly stipend.

8.      The clinical compensation component of a physician's salary is based on a physician's fee-generating productivity. (ALJ Order, R-1821, Exhibit 3; Hearing Transcript, R-1623-1625, Exhibit 5).

**Response:** Defendants do not dispute that the "clinical incentives" portion of a physician's salary at SIU was based on a physician's fee-generating productivity, with the understanding that "productivity," as used in this context, is defined as the amount of RVUs that a physician earned in the relevant period.  R-1821.  Defendants further do not dispute that for most of the physicians whose compensation is in the record, including Ahad, clinical compensation consisted exclusively of clinical incentives. However, surgeons whose academic base was $114,000 or less could receive a "clinical base."  R-615.  The 2011 contract for Dr. K appears to incorporate a clinical base.  R-455. Defendants do not believe this dispute is material given that clinical base appears to have been a narrow exception, rather than the rule, and in any event, the precise apportionment of clinical compensation is irrelevant to whether Ahad received the actual wage.

43

17.     The purpose of the Compensation Plan is to further the objectives of the University. (Compensation Plan, R-0611, Exhibit 8).

**Response:** Defendants admit that the stated purpose of the Plan is to further the objectives of the University.  R-611.  The record provides no basis for evaluating the veracity of the Plan's statement.  The purpose of the Plan is immaterial to whether Ahad was paid the required wage under the H-1B statute and regulations.

18.     The Compensation Plan is designed to ensure that faculty members' compensation determined pursuant to the Plan represents fair and reasonable compensation for the efforts of faculty members. *Id*.

**Response:** Defendants admit that the Plan states that it is designed for these purposes.  R-611.  The record provides no basis for evaluating the veracity of the Plan's statement.  The purpose of the Plan is immaterial to whether Ahad was paid the required wage under the H-1B statute and regulations.

36.     During Dr. Ahad's tenure with the University, no other physician had completed a fellowship in minimally invasive surgery. (Decl. of Dr. Gary Dunnington, R-1263, ¶ 6, Exhibit 7); Hearing Transcript, 1596-1597, Exhibit 5).

**Response:** Dunnington's declaration states only that he was "not aware" of any other surgeon at SIU who completed such a fellowship, and the cited pages of the hearing transcript contain testimony only that several doctors within the division had not completed such a fellowship.  In any event, this dispute is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

44

39.     Dr. Ahad was the only laparoscopic bariatric surgeon while she was at SIU. (Hearing Tr., R-1589, <u>Exhibit 5</u>); Defs.' Answer, Dkt. No. 16, ¶ 17).

**Response:** Neither the cited page nor Defendants' Answer definitively supports this statement.  In the cited page of the hearing transcript, Dr. Ahad testified that she served as a laparoscopic bariatric surgeon while at SIU.  R-1589.  In Defendants' Answer, Defendants admitted that Dr. Ahad was the first fellowship-trained bariatric surgeon at the University and remained the only fellowship-trained bariatric surgeon during her employment there, and that while Ahad worked at the University, no other physician there offered laparoscopic gastric bypass surgery.  Defs.' Answer ¶ 17.  The record does not definitively establish whether there were other "laparoscopic bariatric surgeons" at SIU while Ahad was there, although Defendants agree, as stated in their Answer, that Ahad was the only fellowship-trained bariatric surgeon at SIU during her employment there.  In any event, this dispute is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

61.     Section H of the PERM (p. 2 of 14) identified the "Job title" as "Assistant Professor of Surgery/Bariatric Surgeon." (Hearing Transcript, 1586-1587, <u>Exhibit 5</u>; PERM Application, R-1275, <u>Exhibit 14</u>). Section H (p. 11 of 14) listed the job duties for the position as bariatric surgery. PERM Application, R-1284, <u>Exhibit 14</u>).

**Response:** Defendants do not dispute the first sentence.  As to the second sentence, the section does not describe the job duties as exclusively involving bariatric surgery.  For example, teaching duties include "general surgery and bariatric surgery as

well as general medical care." R-1284. The description of clinical responsibilities simply states that Ahad would "develop and maintain a professional practice in accordance with departmental policy and practice plan." *Id.* In any event, the PERM application's characterization of Ahad's job is immaterial to the actual wage determination; rather, the "actual duties, responsibilities, and functions" of her position inform the actual wage determination. 57 Fed. Reg. 1316, 1319-20 (Jan. 13, 1992).

63.     The record contains no evidence that Dr. Ahad ever objected to her title as Assistant Professor of Surgery/Bariatric Surgery or that she was paid less in contravention of the INA. (R- *passim*).

**Response:** This statement is based on a mistaken premise; Ahad's formal job title at SIU was not "Assistant Professor of Surgery/Bariatric Surgery," but Assistant Professor in the Division of General Surgery. R-526-29, R-572-80, R-1521. In any event, whether Ahad objected to a characterization of her position is irrelevant to the actual wage determination; rather, the "actual duties, responsibilities, and functions" of her position inform the actual wage determination. 57 Fed. Reg. at 1319-20.

68.     Dr. Ahad executed compensation agreements with the University on August 10, 2011, July 23, 2012, and August 28, 2013. (Dr. Ahad's Compensation Agreements, R-443-446, Exhibit 9; Hearing Transcript, R-1563, Exhibit 5).

**Response:** Ahad appears to have signed the 2013 compensation agreement on August 26, 2013, not August 28. R-446. The date of signature is immaterial to the dispute at issue.

46

116.   Dr. E. did not perform bariatric surgery while Dr. Ahad was employed by the University. (Decl. of Dr. Mellinger, R-1241-1243, ¶ 2, November 2015, Exhibit 11).

**Response:** The cited pages do not support this assertion.  Dr. Mellinger's declaration states that "[n]o other physician at SIU *primarily* performed bariatric surgeries like Dr. Ahad."  R-1241 (emphasis added).  Defendants are unaware of any evidence in the record as to whether Dr. E performed any bariatric surgeries while Ahad was employed by SIU.  In any event, this dispute is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

129.   Dr. K specialized in colon and rectal surgery during his medical fellowship. (Hearing Transcript, R-1541, R-1578, Exhibit 5).

**Response:** Defendants dispute only the term "fellowship" as the record indicates that Dr. K completed two fellowships.  R-1578.  The number of fellowships Dr. K completed is immaterial to the dispute at issue.  Additionally, the specific subjects of Dr. K's fellowships are immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

135.   Dr. K resigned his employment with the University on April 4, 2013. (Dep. of Dr. K, R-822, Exhibit 25).

**Response:** In the cited page, Dr. K does not testify as to the date of his resignation; that date is provided in a question by counsel that Dr. K did not answer.  In

47

any event, the date of Dr. K's determination is irrelevant to whether Ahad was paid the required wage.

136.    In 2014, Dr. Ahad submitted a complaint to the Wage and Hour Division of the DOL via an ESA Form WH-4 alleging that the University failed to pay her the actual wage for her position as Assistant Professor of Surgery/Bariatric Surgeon during her H-1B employment status. (ALJ Order, R-1816, Exhibit 3).

**Response:** Defendants dispute only the characterization of Ahad's complaint as one alleging that SIU "failed to pay her the actual wage for her position as Assistant Professor of Surgery/Bariatric surgeon." The portion of Ahad's complaint contained in the record alleged that SIU failed to pay her the higher of the prevailing or actual wage, and did not include a description of her position; only the attached 2011 LCA, which SIU completed, named the position as Assistant Professor of Surgery/Bariatric Surgeon. R-4-13.  In any event, even if accurate, Ahad's characterization of her position would be immaterial; rather, the "actual duties, responsibilities, and functions" of her position inform the actual wage determination.  57 Fed. Reg. at 1319-20.

137.    Dr. Ahad's complaint followed her husband's termination. (Dep. of Dr. Ahad, R- 711-713, Exhibit 6). Prior to that time, Dr. Ahad had not submitted a formal complaint about her wages. Id.

**Response:** Defendants do not dispute that Ahad's complaint came about a year after her husband left SIU.  R-712-13.  Defendants dispute the characterization of her husband's departure from SIU as a "termination," which can be read to suggest that her husband left SIU involuntarily; Ahad's testimony was that her husband resigned.  R-

712. SIU confirms this in its own statement of facts. *See* Pl.'s SF 135. This dispute is immaterial because the timing of Ahad's complaint and the circumstances of her husband's departure from SIU are irrelevant to whether she was paid the required wage.

**IV.    Undisputed Immaterial Facts**

3.       All University physicians received compensation based on the two-component model. (Dep. of Dr. Ahad, R-694, Exhibit 6).

**Response:** This fact is immaterial given that the facially neutral formula was not implemented neutrally toward Ahad, given the steps SIU took to deny her opportunities to earn compensation. *See* SF 52-86.

28.      In 2007, the University advertised an opening specifically for an Academic Bariatric Surgeon position in the Annals of Surgery. (Defs.' Answer, Dkt. No. 16, ¶ 11)

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' actual job duties, regardless of what the University prioritized when it hired her. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

30.      According to Dr. Ahad, she "was hired at SIU as a bariatric surgeon." (Dr. Ahad's Correspondence Regarding Evaluation ("Dr. Ahad Evaluation Correspondence"), R-0485-487, p. 486, Exhibit 10).

**Response:** This fact is immaterial because Ahad's characterization of her position is irrelevant to the actual wage determination; rather, the "actual duties, responsibilities, and functions" of her position inform the actual wage determination. 57 Fed. Reg. at 1319-20.

33.     Dr. Ahad represented to the Illinois Department of Health that it should recommend a J-1 waiver on her behalf because "the Department of Surgery is searching for trained physicians who can offer *expert* care in minimally invasive surgery and Bariatric surgery." (Dr. Ahad's Correspondence to the Illinois Department of Health ("Department of Health Correspondent"), R- 0601-602, p. 601, Exhibit 13 (emphasis added)).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and actual job duties, regardless of what the University prioritized when it hired her.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

34.     No other physician at the University primarily performed bariatric surgeries during Dr. Ahad's H-1B period. (Decl. of Dr. John Mellinger, R-1241-1243, ¶ 2, November 2015, Exhibit 11).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and actual job duties.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

35.     The University offered Dr. Ahad the position primarily because of her completion of the minimally invasive surgery fellowship at the University of Washington. (Decl. of Dr. Gary Dunnington, R-1263, ¶ 4, Exhibit 7).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and actual job duties, regardless

of what the University prioritized when it hired her.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

37.     Upon her hire, Dr. Ahad became the first fellowship-trained bariatric surgeon at the University and remained such during her entire employment with the University. (Defs.' Answer, Dkt. No. 16, ¶ 17); (Dep. of Dr. Ahad, R-660-661, Exhibit 6; Hearing Transcript, R-1583, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and actual job duties.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

38.     Dr. Ahad was also hired to be the Director of the Center of Bariatric Surgery. (Decl. of Dr. Gary Dunnington, R-1263, ¶ 5, Exhibit 7; Hearing Transcript, R-1585-1586, Exhibit 5; Dep. of Dr. Ahad, R-658-659, 756-757, Exhibit 6).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and actual job duties, regardless of what the University prioritized when it hired her.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

40.     During Dr. Ahad's H-1B employment, laparoscopic bariatric surgery was "very new" and "that's why it's important to be fellowship trained as a laparoscopic bariatric surgeon." (Hearing Transcript, R-1714, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

51

46.     The University had a busy breast surgery practice. (Hearing Transcript, R-1573, <u>Exhibit 5</u>).

**Response:** This fact is immaterial because the ALJ found that SIU's offer for Ahad to take over the breast practice was "impractical."  R-1831; SF 87-91.

47.     Dr. Ahad admitted that the request to take over the breast surgery practice was "to mean [to] change her line of primary surgical focus" and "[c]hange [her] career path." (Hearing Transcript, R-1573, <u>Exhibit 5</u>).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102102.

48.     Dr. Ahad refused to take over the breast surgery practice partly because her J-1 Visa was based on her being a bariatric surgeon. (Hearing Transcript, R-1574, <u>Exhibit 5</u>; Dr. Ahad Evaluation Correspondence, Exhibit 10).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

54.     With respect to teaching, Dr. Ahad testified that "[w]e were normally assigned topics that was our *primary area focus*. So if it was bariatric surgery, I would talk to them about bariatric surgery. If it was, you know, breast surgery, Dr. Dunnington would be talking to them about breast surgery." (Hearing Transcript, R-1533 (emphasis added), <u>Exhibit 5</u>).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

55.     Dr. Ahad repeatedly testified that "primarily her focus was on bariatric." Hearing Transcript, R-1534; *see also id.*, R-1533, <u>Exhibit 5</u>).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

57.     The PERM application provided that the successful candidate for the position must have completed a fellowship in laparoscopic surgery or laparoscopic bariatric surgery. (Hearing Transcript, 1590, <u>Exhibit 5</u>; PERM Application, R-1276, <u>Exhibit 14</u>; Defs' Answer, Dkt. No. 16, ¶ 18).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and actual job duties, regardless of what the University prioritized when it hired her. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

58.     On or around June 16, 2010 (before her H-1B employment), Dr. Ahad reviewed the PERM application, verifying under penalty of perjury that Sections J and K are true and correct, and signed it. (Perm Application, R-1281, <u>Exhibit 14</u>).

**Response:** This fact is immaterial because Ahad's characterization of her position is irrelevant to the actual wage determination; rather, the "actual duties,

responsibilities, and functions" of her position inform the actual wage determination. 57 Fed. Reg. at 1319-20.

59.    In Section K (Job 1), which was her job for the University, the PERM identified the Job Title as Assistant Professor/Baria[tric Surgeon]." (PERM Application, R-1279, Exhibit 14).

**Response:** This fact is immaterial because Ahad's characterization of her position is irrelevant to the actual wage determination; rather, the "actual duties, responsibilities, and functions" of her position inform the actual wage determination. 57 Fed. Reg. at 1319-20.

60.    In signing the PERM, Dr. Ahad also "further declare[d] under penalty of perjury that [she] intends to accept the position offered in Section H of this application." (PERM Application, R-1281, Exhibit 14).

**Response:** This fact is immaterial because Ahad's characterization of her position is irrelevant to the actual wage determination; rather, the "actual duties, responsibilities, and functions" of her position inform the actual wage determination. 57 Fed. Reg. at 1319-20.

69.    Dr. Ahad negotiated her salary when she was first hired. (Hearing Transcript, R- 1581, Exhibit 5).

**Response:** This fact is immaterial because employers must pay the required wage regardless of any private contracts between the employer and employee. *See Kutty v. U.S. Dep't of Labor*, No. 3:05-CV-510, 2011 WL 3664476, at *9 (E.D. Tenn. 2011).

74.     In 2011, Dr. Ahad took two weeks and three days of vacation time. (Hearing Transcript, R-1575, Exhibit 5).

**Response:** The amount of vacation Ahad took is immaterial because the ALJ found that there was no evidence she took any more vacation than the Comparators. *See* SF 118.

77.     In 2012, Dr. Ahad took four weeks of vacation. (Hearing Transcript, R-1576, Exhibit 5).

**Response:** The amount of vacation Ahad took is immaterial because the ALJ found that there was no evidence she took any more vacation than the Comparators. *See* SF 118.

83.     At all times during her H-1B employment, Dr. Ahad was offered the same clinical compensation formula as all other surgeons in the General Surgery Division. (Compensation Plan, 611-628, Exhibit 8).

**Response:** This fact is immaterial given that the facially neutral formula was not implemented neutrally toward Ahad, given the steps SIU took to deny her opportunities to earn compensation.  *See* SF 52-86.

84.     Dr. Ahad did not earn any RVUs while on vacation. (Hearing Transcript, R-1584, Exhibit 5).

**Response:** The amount of RVUs Ahad earned while on vacation is immaterial because the ALJ found that there was no evidence she took any more vacation than the Comparators.  *See* SF 118.

85.     Dr. Ahad did not earn any RVUs while on pregnancy leave. (Hearing Transcript, R-1671, Exhibit 5).

**Response:** This fact is immaterial given that the ALJ concluded that SIU violated its own maternity leave policy by failing to pay Ahad estimated clinical pay for the latter 26 days of maternity leave.  SF 112-113.

86.     Dr. A specialized in trauma and surgical care during his medical fellowship. (Hearing Transcript, R-1615, 1627, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

89.     Dr. A did not complete a fellowship, like Dr. Ahad, in minimally invasive surgery. (Hearing Transcript, R-1596-1597, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

90.     Dr. A never performed any laparoscopic bariatric surgery while Dr. Ahad was employed by the University (Hearing Transcript, R-1628, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

91.     Performing bariatric surgeries was never part of Dr. A's primary job duties at the University. (Hearing Transcript, R-1630, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

92.     Dr. A's job duties included caring for patients that had life threatening illnesses. (Hearing Transcript, R-1630, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.  Indeed, Ahad noted that bariatric surgeries can be "emergencies," and that complications from bariatric surgeries can be "life-threatening emergencies potentially."  R-702.

93.     Dr. A was a member of the trauma team during Dr. Ahad's employment. (Hearing Transcript, R-1633, Exhibit 5; Deposition of Dr. A, R-1003, Selected Portions, Exhibit 22).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

100.     Dr. B specialized in transplantation and abdominal transplant surgery during his medical fellowship. (Hearing Transcript, R-1640, 1649, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

57

103.    Dr. B did not complete a fellowship, like Dr. Ahad, in minimally invasive surgery. (Hearing Transcript, R-1596, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

104.    During Dr. Ahad's H-1B period, Dr. B did not perform bariatric surgery. (Hearing Transcript, R-1642, R-1651-1652, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

105.    Dr. B took trauma call during his employment with the University. (Dep. of Dr. B, R-1120, Selected Portions, Exhibit 23; Hearing Transcript, R-1652, Exhibit 5).

 **Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities, *see* SF 17, 20, 21a-21q, 21t-v, 22, 92-102, and in light of the fact that Ahad was asked to stop taking trauma call in 2010, R-670-61, 1522, 1826.

106.    In July 2012, breast surgery became Dr. B's primary area of practice. (Hearing Transcript, R-1573, 1642, Exhibit 5).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities.  *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

107.     After July 2012, breast surgeries accounted for 75 to 80 percent of Dr. B's surgeries. (Hearing Transcript, R-1642-1643, <u>Exhibit 5</u>).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

111.     Dr. B's breast surgery practice became a lucrative part of Dr. B's clinical compensation. (Hearing Transcript, R-1649-1650, <u>Exhibit 5</u>).

**Response:** This fact is immaterial because the ALJ found that SIU's offer for Ahad to take over the breast practice was "impractical." R-1831; SF 87-91.

112.     Dr. B's clinical compensation increased after he began performing breast surgery. (Hearing Transcript, R-1650, 1658-1659, Exhibit 5; Clinical Compensation Summaries, R-805-807, <u>Exhibit 18</u>).

**Response:** This fact is immaterial because the ALJ found that SIU's offer for Ahad to take over the breast practice was "impractical." R-1831; SF 87-91.

113.     Dr. E specialized in critical care during his medical fellowship. (Hearing Transcript, R-1721-1722, <u>Exhibit 5</u>).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

122.     Dr. I specialized in surgical oncology during her medical fellowship. (Dr. I's Biography and Compensation Documents, R-403-405, R-451-455, p. 403, <u>Exhibit 24</u>).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

126.    Dr. Ahad admitted that Dr. I's "primary area of focus" was medical oncology and breast surgery. (Hearing Transcript, R-1545, <u>Exhibit 5</u>).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

127.    Dr. I did not complete a fellowship, like Dr. Ahad, in minimally invasive surgery. (Hearing Transcript, R-1596, <u>Exhibit 5</u>).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities. *See* SF 17, 20, 21a-21q, 21t-v, 22, 92-102.

128.    Dr. K is Dr. Ahad's spouse. (Hearing Transcript, R-1540, R-1580, R-1670, <u>Exhibit 5</u>).

**Response:** The relationship of Dr. K to Ahad is irrelevant to whether Ahad and Dr. K shared similar experience, qualifications, and job responsibilities.

131.    Dr. K took trauma call during his employment with the University, and was compensated additionally for doing so. (Hearing Transcript, R-1607, 1670; Dep. of Dr. K, R-829-830, <u>Exhibit 25</u>).

**Response:** This fact is immaterial in light of the substantial similarities between Ahad and the Comparators' experience, qualifications, and job responsibilities, *see* SF

17, 20, 21a-21q, 21t-v, 22, 92-102, and in light of the fact that Ahad was asked to stop taking trauma call in 2010.  R-670-61, 1522, 1826.

132.   Dr. K was a very busy individual. (Hearing Transcript, R-1670-1671, Exhibit 5).

**Response:** Dr. K's productivity as compared to Ahad is immaterial given the steps SIU took to deny Ahad opportunities to earn clinical compensation.  *See* SF 52-86.

## V.   Additional Material Facts

Defendants hereby incorporate their Statement of Undisputed Material Facts as the "additional material facts" required by Local Rule 7.1(D)(2)(b)(5).

## ARGUMENT

## I.   STANDARD OF REVIEW

This Court's review is governed by the APA.  *See* 5 U.S.C. 706.  Under this "deferential standard of review," the Court must affirm the decision below unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Roadway Express, Inc. v. U.S. Dep't of Labor*, 612 F.3d 660, 664 (7th Cir. 2010) (quoting 5 U.S.C. 706(2)(A)).  This standard of review is narrow and does not give the Court the authority to substitute its judgment for that of the agency.  *See Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court's review is limited to the agency's administrative record. *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1081 (7th Cir. 2016).

The Court must give "substantial deference" to the agency's factual findings, *Gimbel v. Commodity Futures Trading Comm'n*, 872 F.2d 196, 199 (7th Cir. 1989), which

61

must be affirmed if they are supported by "substantial evidence," meaning "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Roadway Express*, 612 F.3d at 664 (quoting *Roadway Express, Inc. v. U.S.

Dep't of Labor*, 495 F.3d 477, 483 (7th Cir. 2007)).  Substantial evidence "may be less than

a preponderance" but must be "more than a mere scintilla." *Addis v. Dep't of Labor*, 575

F.3d 688, 690 (7th Cir. 2009). "[T]he possibility of drawing two inconsistent conclusions

from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." *Johnson v. Nat'l Transp. Safety Bd.*, 979 F.2d 618, 620

(7th Cir. 1992).  This Court "may not set aside an inference merely because it finds the

opposite conclusion more reasonable." *Addis*, 575 F.3d at 690.  Conclusions of law are

reviewed de novo, *Director, O.W.C.P., U. S. Dep't of Labor v. Ball*, 826 F.2d 603, 604 (7th

Cir. 1987), deferring to the agency's reasonable interpretations of statutory ambiguities,

*see Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984); *Our Country

Home Enters. v. Comm'r of Internal Revenue*, 855 F.3d 773, 785 (7th Cir. 2017).

## II.    LEGAL FRAMEWORK

This case arises under the H-1B visa provisions of the INA, which allow

employers to bring temporary workers to the United States to perform "specialty

occupations." 8 U.S.C. 1101(a)(15)(H)(i)(b1).  Congress created employment standards

for H-1B workers and delegated the enforcement of these standards to DOL.  8 U.S.C.

1182(n).  As relevant here, employers must pay H-1B workers a required wage, which is

the higher of (1) "the actual wage level paid by the employer to all other individuals

with similar experience and qualifications for the specific employment in question," or

(2) "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. 1182(n)(1)(A)(i).  Here, because Ahad's annual wages exceeded the $130,780 prevailing wage, *see* SF 24, the relevant question is whether SIU paid her the actual wage.

An employer hiring an H-1B worker must submit to DOL an LCA representing that it will pay the required wage.  *See* 8 U.S.C. 1182(n)(1); 20 C.F.R. 655.730(a).  If an "aggrieved party" later makes a complaint regarding the required wage, WHD investigates and issues a determination, which interested parties may challenge before an ALJ.  8 U.S.C. 1182(n)(2); 20 C.F.R. 655.800, 655.805(a)(2), 655.815, 655.820.  The ALJ renders a decision following an evidentiary hearing.  20 C.F.R. 655.825; 29 C.F.R. Part 18.  Parties may then appeal to the ARB, 20 C.F.R. 655.845, which issues final decisions for DOL, *see* 77 Fed. Reg. 69378, § 5(c)(26) (Nov. 16, 2012).  The ARB generally defers to the ALJ's reasonable findings of fact, and reviews legal conclusions *de novo*. *See* R-2322 & nn. 14-15.

### III.   THE ARB AND ALJ REASONABLY CONCLUDED THAT AHAD'S EXPERIENCE, QUALIFICATIONS, AND SPECIFIC POSITION WERE COMPARABLE TO THOSE OF THE FIVE COMPARATOR SURGEONS.

SIU was required to pay Ahad "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question." 8 U.S.C. 1182(n)(1)(A)(i)(I).  The regulations explain that "in determining [the actual] wage level, [six] factors may be considered: Experience, qualifications, education, job responsibility and function, specialized knowledge, and other legitimate business factors." 20 C.F.R. 655.731(a)(1). "Where there are other employees with substantially similar experience and qualifications in the specific

employment in question—i.e., they have substantially the same duties and responsibilities as the H–1B nonimmigrant—the actual wage shall be the amount paid to these other employees." *Id.* On the other hand, "[w]here no such other employees exist at the place of employment, the actual wage shall be the wage paid to the H-1B nonimmigrant by the employer." *Id.*

The ALJ determined the "actual wage" by carefully examining the experience, qualifications, and job responsibilities of Ahad and the five Comparators—Drs. A, B, E, I, and K. SF 92. Substantial evidence supported his conclusion, affirmed by the ARB, that while the Comparators' experience, qualifications, and positions may not have been identical to Ahad's, they were sufficiently similar under the above standards. SIU's argument that Ahad was comparable only to herself, and that the "actual wage" is simply what she was paid, is inconsistent with the statute, regulations, and administrative record.

### A. Actual Wage Comparators' Experience, Qualifications, and Position Need Not Be Identical to Those of an H-1B Worker.

The ALJ and ARB correctly concluded that Ahad's "experience and qualifications" and "specific employment" did not have to be exactly the same as the Comparators'. Instead, actual wage comparators must have "similar experience and qualifications." 8 U.S.C. 1182(n)(1)(A)(i)(I); *see* 20 C.F.R. 655.731(a)(1) (comparators and the H-1B worker must share "substantially similar experience and qualifications"). "Similarity is not identity, but resemblance between different things." *United States v. Raynor*, 302 U.S. 540, 547 (1938); *cf. United States v. Washam*, 312 F.3d 926, 930-31 (8th Cir.

64

2002) ("The term 'substantially similar' . . . does not mean 'exactly the same.'"); *Watkins v. J & S Oil Co.*, 164 F.3d 55, 59 (1st Cir. 1998) (distinguishing a "substantially equal or similar" position from one that is "identical or exactly the same").  Rather, two things that have "essential elements in common" may be substantially similar.  *Almeda Mall, L.P. v. Shoe Show, Inc.*, 649 F.3d 389, 392 (5th Cir. 2011).

Likewise, actual wage comparators must have "substantially the same duties and responsibilities" as the H-1B worker.  20 C.F.R. 655.731(a)(1).  The regulation's preamble confirms that this term should be read expansively, "caution[ing] employers that [very][14] few positions would be considered by DOL to be truly unique, since this distinction cannot be established through differing job titles or minor variations in day-to-day work assignments where other individuals with similar experience and qualifications perform substantially the same duties and responsibilities as the H-1B nonimmigrant."  57 Fed. Reg. 1316, 1320 (Jan. 13, 1992).  Rather, under the "rare circumstances" where an H-1B employee has a "truly unique" position, that position must be "one which is unlike any other position at the workplace in regard to [the six factors listed in 655.731(a)(1)].  *Id.*  As discussed below, substantial evidence supported the ALJ's conclusion, affirmed by the ARB, that whatever differences existed between Ahad's job and the Comparators', the similarities were sufficient such that the Comparators' wages could be used to calculate the "actual wage" applicable to Ahad.

---

[14] The preamble contains a typographical error, erroneously reading "every few positions."

### B. Substantial Evidence Supported the Finding that Ahad and the Comparators Had Substantially Similar Experience, Qualifications, and Job Responsibilities.

Six factors inform the related inquiries of whether comparators have "similar experience and qualifications" and what the "specific employment in question" is: "experience, qualifications, education, job responsibility and function, specialized knowledge, and other legitimate business factors."  20 C.F.R. 655.731(a)(1).

Ahad and the five Comparators shared substantially similar experience, qualifications, and education.  All had 11 to 14 years of training, including a generalized medical school education and a general surgery residency including rotations through different subspecialties.  SF 1-4, 6, 94.  As a result, all could perform general surgery and operate on anything in the abdomen.  SF 15, 20, 21a.  While all had at least one fellowship or training in a surgical subspecialty, this constituted only a small minority—only 1 to 2 years—of their education and training.  SF 4, 6, 94.  All had minimal or no prior professional experience.  SF 95-96.

Because of these similarities, SIU hired Ahad and the Comparators to identically titled positions—Assistant Professor with an appointment to the Division of General Surgery.  SF 8, 16, 41, 93.  All performed administrative, teaching, research, and clinical work, with clinical work constituting 45 to 60 percent of their duties.  SF 17, 98.  Because of their general proficiency, all assistant professors in the Division, including Ahad and the Comparators, performed general surgeries, such as gallbladder surgeries, appendectomies, hernia surgeries, and removing small masses.  SF 21a, 21f, 21i, 21j, 21m, 21n, 21o.  All, at least initially, were offered the chance to take trauma call.  SF

21b.[15]  And their common training and "easily transferable" skills enabled them to "expertly" take care of each other's patients.  SF 21c.

SIU argues that Ahad's "specialized knowledge" and "job responsibilities and function" differed from the Comparators', and that SIU's recruitment of Ahad based on her laparoscopic surgery fellowship proves that her position was unique.  But regardless of what SIU prioritized when it hired Ahad, substantial evidence supported the ALJ's finding that her actual duties were substantially similar to the Comparators'.  *See* R-1822-25.  Specifically, while Ahad and the Comparators had different subspecialties, this did not preclude them from doing substantial work outside those subspecialties or even changing subspecialties altogether.  SF 21a-21q, 21t-v, 22, 97.

For example, as noted above, Ahad and the Comparators performed general surgeries and had the opportunity to take trauma call.  Ahad took trauma call and general surgery call at various points, practiced endoscopic and foregut surgery, and began developing a regular foregut practice.  SF 21f, 21g.  One Comparator, Dr. I, had a fellowship in complex general surgery oncology, but also performed breast, pancreas, and hepatobiliary surgeries.  SF 21o.  Ahad and two Comparators, Drs. E and B, were each offered the opportunity to take over SIU's breast practice, despite being fellowship trained in laparoscopic, critical care, and transplantation surgery, respectively.  SF 21h,

---

[15] While SIU argues that Ahad was distinguishable from the Comparators in part because she did not take trauma call, Pl.'s Br. 33, Ahad did take trauma call until SIU asked her not to do so.  *See infra* at 78-79.

21k, 21m, 22b, 22c.[16]  Dr. B accepted the offer, and now primarily practices breast

surgery rather than transplant surgery.  SF 21k, 22c.  Even before taking over the breast

practice, Dr. B focused more on general surgery than on his fellowship-trained

subspecialty.  SF 21l.  Dr. E, fellowship trained in critical care, shifted his focus to

general surgery and hernia repairs.  SF 22a.  Dr. K, who specialized in colorectal

surgery, also took trauma call and general surgery call.  SF 21n.  Surgeons also taught

courses outside of their subspecialties; for example, Ahad taught trauma, foregut, and

breast surgery.  SF 21d, 21e.

Moreover, Ahad and the Comparators spent only a small minority of their time

performing surgeries in their subspecialties.  SF 99-101.  Ahad, based on her estimates,

spent only about 13 to 17 percent of her time performing bariatric surgeries, while

doctors specializing in trauma care performed fewer than one trauma surgery per week.

SF 42, 99a, 99b, 101.[17]  Most of Ahad and the Comparators' time, therefore, was spent in

teaching, administrative work, or non-surgical clinical tasks such as consultations,

evaluations, and "rounds."  SF 102.  Given the considerable overlap in the majority of

their duties, the surgeons' different subspecialties are not dispositive.  *See McMillan v.*

*Mass. Soc'y for Prevention of Cruelty to Animals*, 140 F.3d 288, 296, 297 n.2, 311 (1st Cir.

---

[16] Although SIU maintains that Ahad's refusal to take over the breast practice shows that she was a bariatric rather than a general surgeon, Pl.'s Br. 33 n.10, that SIU offered her the practice at all supports the ALJ's finding that while Ahad specialized in bariatrics, she was proficient in other areas.

[17] The percentages for Ahad are derived from the fact that Ahad spent 60 percent of her time on clinical work, SF 42, and spent 30 to 40 percent of this time doing surgeries, SF 99a, of which 70 percent were bariatric, SF 101.

1998) (affirming pay discrimination verdict in favor of veterinary hospital's radiology

department head, where comparators were heads of surgery, pathology, and medicine

departments); *Ridgway v. United Hosps.-Miller Div.*, 563 F.2d 923, 925, 927 (8th Cir. 1977)

(affirming Equal Pay Act conclusion that plaintiff's work as an "ophthalmological

technician" was substantially equal to that of a "urological assistant" where both

performed similar tasks during different types of surgeries).

　　To be sure, Ahad possessed specialized knowledge in bariatric and laparoscopic

surgery.  But other surgeons still worked in those areas.  Eight surgeons at SIU,

including three of the five Comparators—Drs. A, B, and I—performed some

laparoscopic procedures despite not being fellowship trained in laparoscopic surgery.

SF 21p.  Dr. B taught medical students and residents about laparoscopic surgery.  SF

21q.  The Division's chair, Mellinger, considered four other surgeons, including two

Comparators, capable of assisting in bariatric call despite not specializing, or being

fellowship trained, in bariatric surgery, and later assigned other surgeons to bariatric

call.  SF 21t, 21u.  At least two surgeons performed bariatric surgery despite lacking

fellowship training.  SF 21r, 21s.  One, Dr. Sutyak, directed the bariatric program before

Ahad's arrival.  SF 21s.  And other surgeons "expertly" handled complications from

bariatric surgeries.  SF 21v.[18]  Thus, substantial evidence supported the ALJ's finding

---

[18] SIU overstates its case by claiming that "[n]one of the alleged comparator surgeons performed any bariatric surgeries during Dr. Ahad's H-1B employment."  Pl.'s Br. 32. While Dr. B never performed bariatric surgeries, R-1642, the record is inconclusive as to whether the other Comparators did.  *See, e.g.*, R-1630 (testimony by Dr. A that bariatric surgeries were not part of his "*primary* duties") (emphasis added); R-1241 (declaration by Mellinger that "[n]o other physician at SIU *primarily* performed bariatric surgeries

69

that notwithstanding their specialized training and knowledge, Ahad and the Comparators shared "similar experience and qualifications for the specific employment in question."  8 U.S.C. 1182(n)(1)(A)(i)(I).

The cases SIU cites are not to the contrary.  Defendants do not dispute that workers whose job responsibilities, *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 822-23 (7th Cir. 2011); *Chiaramonte v. Animal Med. Ctr.*, No. 13 Civ 5117, 2016 WL 299026, at *14 (S.D.N.Y. Jan. 22, 2016), or skills and experience, *Beall v. Curtis*, 603 F. Supp. 1563, 1578 (M.D. Ga. 1985), differ substantially will generally not be comparable.  But as explained above, substantial evidence supported the finding that Ahad and the Comparators shared substantially similar experience and qualifications, and that their subspecialties were less significant due to their overlap in responsibilities and the fluidity of subspecialty practice within the Division.  Subspecialties may also be a basis for distinction if evidence establishes that one subspecialty is compensated at a higher rate than another.  *See Reznick v. Assoc. Orthopedics & Sports Med., P.A.*, 104 F. App'x 387, 391 (5th Cir. 2004).  But SIU presented no evidence that bariatric surgeons are compensated lower than other general surgeons; in fact, there was evidence to the contrary.  R-954, R-1554-55 (report showing that median compensation for bariatric surgeons was higher than for general and trauma surgeons).

---

like Dr. Ahad") (emphasis added).  Additionally, SIU's assertion that patients had to be referred outside SIU after Ahad's departure, while supported by Mellinger's testimony, should be viewed with some skepticism given that SIU still employed Dr. Sutyak, who had previously performed bariatric surgeries, and given that Dr. T, who was fellowship trained in minimally invasive and bariatric surgery, began working at SIU shortly after Ahad's resignation.  *See* Resp. to Pl.'s SF 67.

Ahad's signing of a "PERM" application listing her title as "Assistant Professor of Surgery/Bariatric Surgeon," and her lack of objection to that title, also do not undermine the ALJ and ARB's conclusions. The preamble to the actual wage regulation emphasizes that "job title alone is not dispositive," and that "different job titles alone are meaningless if the job duties, responsibilities and functions are substantially the same." 57 Fed. Reg. at 1319, 1320. Moreover, Ahad's actual job title at SIU was not "bariatric surgeon" but Assistant Professor in the Division of General Surgery, SF 8, 41, and "like job titles presume like jobs with similar job duties, responsibilities and functions," even though they are not conclusive. *Id.* at 1319.

Likewise, SIU's reliance on 20 C.F.R. 655.731(c)(8), Pl.'s Br. 32, is misplaced. This regulation provides: "If the employee works in an occupation other than that identified on the employer's LCA, the employer's required wage obligation is based on the occupation identified on the LCA, and not on whatever wage standards may be applicable in the occupation in which the employee may be working." As an initial matter, SIU is precluded from raising arguments based on 655.731(c)(8). When a litigant fails to raise issues in adversarial administrative proceedings such as those before DOL ALJs and the ARB, it forfeits the ability to raise those issues in judicial review of those proceedings. *See Formella v. U.S. Dep't of Labor*, 628 F.3d 381, 389-90 (7th Cir. 2010). SIU never invoked 655.731(c)(8) below, *see* R-1790-1814, R-1845-67, R-2014-44, R-2307-18, and therefore cannot do so now. Additionally, neither the ALJ nor the ARB based their decisions on a finding that Ahad "work[ed] in an occupation other than that identified on the employer's LCA." Rather, consistent with the LCA's description of her as an

71

"Assistant Professor of Surgery/Bariatric Surgeon," and a "Health Specialties Teacher[],

Postsecondary," R-772, the ALJ and ARB recognized that Ahad subspecialized in

bariatric surgery, but had substantially similar experience, qualifications, and duties to

other assistant professors in the Division with different subspecialties. This finding was

consistent with 655.731(c)(8) and with the ALJ and ARB's decision to use the

Comparators to determine the actual wage.[19]

Defendants recognize that this Court recently decertified an Equal Pay Act

collective action brought by Ahad against SIU, in part because it found that Ahad and

the three opt-in plaintiffs had "disparate job duties and work settings." *Ahad v. Bd. of

Trustees of S. Ill. Univ.* No. 3:15cv3308, 2019 WL 1433753, at *4 (C.D. Ill. Mar. 29, 2019).

Aside from the different procedural posture and statutory framework, *Ahad* is

distinguishable for several reasons. Most importantly, here, the Court must review

DOL's decision under the deferential APA standard, *see supra* § I, and must defer to

findings of fact supported by substantial evidence in the agency's record, even if the

evidence could also support a contrary conclusion. *Johnson*, 979 F.2d at 620; *Addis*, 575

F.3d at 690. *Ahad*, in contrast, was a *de novo* decision based on an evidentiary record

compiled in this Court. As discussed above, substantial evidence supports the finding

---

[19] Even to the extent that the ALJ's articulation of Ahad's position, Assistant Professor with an appointment to the Division of General Surgery, differed slightly from the description in the LCA, "occupation," as used in 655.731(c)(8), is a broad term that permits such minor distinctions. *See infra* at 81-82. *Compare Amtel Group of Fla., Inc. v. Rungvichit Yongmahapakorn*, ARB No. 04-087, ALJ No. 2004-LCA-006, 2006 WL 2821406, at *4 (ARB Sept. 29, 2006) (citing 655.731(c)(8) to reject employee's contention that she should have been paid as a vice president, when the LCA described her as an internal auditor).

72

below that the similarities in Ahad and the Comparators' education, experience, and job duties outweigh the differences—even if a factfinder could plausibly find otherwise.

Additionally, Ahad and the Comparators share more similarities than the three opt-in plaintiffs in *Ahad*. Here, as discussed above, the Comparators were all Assistant Professors in the Division of General Surgery, and thus had substantially similar experience, education, training, and job responsibilities. In *Ahad*, only one opt-in worked in the Division, and she was an Associate, not Assistant, Professor; the other two were Assistant Professors but worked in a different division (Cardiothoracic Surgery) and department (Department of Family and Community Medicine), respectively. *Ahad*, 2019 WL 1433753, at *5 (also noting that one opt-in was in "an entirely different job setting" as a family practice physician and that her teaching duties related to osteopathic medicine). Here, Ahad and the Comparators devoted similar percentages of their time to clinical work, research, and teaching. SF 98. In *Ahad*, these percentages diverged more significantly among the opt-ins. *Ahad*, 2019 WL 1433753, at *5 (estimated time spent on clinical work ranged from 25 to 60 percent; teaching time ranged from 25 to 50 percent; one professor devoted as much as half her time to research, while another devoted nearly none). Finally, in *Ahad*, the record included evidence of "highly individualized" market factors affecting Ahad and the opt-in plaintiffs' compensation. *Id.* at *6-*7. In contrast, here, the evidence supporting the differences in Ahad and the Comparators' compensation was primarily limited to two factors: clinical productivity and whether a physician was on the trauma team or took trauma call. Particularly given that, as discussed below, Ahad's productivity levels and

73

absence from the trauma call schedule both directly resulted from SIU's own actions, the ALJ and ARB reasonably found that these two factors were insufficient to overcome the substantial evidence that Ahad and the Comparators shared similar experience and qualifications for the specific employment in question.

### IV.    SIU FORFEITED ITS NEW ARGUMENT REGARDING ITS PRODUCTIVITY-BASED COMPENSATION SYSTEM BY FAILING TO RAISE IT BELOW.

SIU argues for the first time that it did not violate the required wage provisions because legislative intent demonstrates that its uniformly-applied productivity-based system paid Ahad the actual wage in the first instance.  Pl.'s Br. 24-30.  This argument has been forfeited because SIU failed to raise it below.  As explained above, arguments not presented to the ALJ or ARB cannot be raised when challenging their decisions.  *See supra* at 71 (citing *Formella*, 628 F.3d at 389-90).  SIU's briefs below did not advance the argument that SIU asks this Court to consider.  *See* R-1790-1814, R-1845-67, R-2014-44, R-2307-18.  Rather, SIU characterized Ahad's lower clinical compensation as an "authorized deduction" from the required wage under 20 C.F.R. 655.731(c)(9)(ii).  R-1810-12, R-1853-57, R-2028-33, R-2308-13.  SIU has now abandoned this "authorized deduction" argument, relegating it to a footnote.  *See* Pl.'s Br. 28 n.6; *Moriarty ex rel. Local Union No. 727 v. Svec*, 429 F.3d 710, 722 (7th Cir. 2005) ("A footnote does not preserve an issue for review.").[20]

---

[20] Even if properly raised in this Court, SIU's "authorized deduction" argument would fail.  SIU argued below that Ahad's lower wages for lower productivity were permitted by 655.731(c)(9)(ii), which allows certain "authorized deductions" from the required wage that are "reasonable and customary in the occupation and/or area of

As the stark differences between SIU's arguments to this Court and to the ALJ and ARB demonstrate, arguing that lower compensation fits the regulatory definition of an "authorized deduction" from wages, as SIU did below, is fundamentally different from asserting, as it does now, that legislative intent demonstrates that SIU's RVU-based system paid Ahad the actual wage in the first instance because it was uniformly applied.  Neither the ALJ nor the ARB had an opportunity to adjudicate this argument, and this Court should not consider it.  *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").  Thus, since

---

employment, (e.g., union dues; contribution to premium for health insurance policy covering all employees; savings or retirement fund contribution . . . )."  First, contrary to SIU's contention, the ALJ and ARB squarely considered, and rejected, SIU's argument. R-1827-30; R-2324-25 & n.17.  Second, as the ALJ concluded, no "deductions" occurred at all because Ahad's clinical compensation consisted entirely of "clinical incentives" without any gross amount from which to "deduct."  *See* SF 32, R-1828 ("[I]t is not that SIUSM deducted wages from Dr. Ahad's paycheck; it did not pay her because she did not generate enough RVUs.").  Third, even if Ahad's lower pay were considered a deduction, substantial evidence supported the ALJ and ARB's conclusion that SIU had failed to establish that any "deduction" was "customary," since SIU did not provide any evidence on RVU-based compensation systems beyond its own workforce.  *See* R-1828, R-2324-25; *see also* R-1812 (assertion, without evidence, in SIU's brief that "[t]his type of deduction is reasonable and customary in [Ahad's] occupation").  Finally, substantial evidence supported the conclusion that any "deduction" was not "reasonable," since, as discussed below, *see infra* § V, Ahad's lower productivity was SIU's fault, not Ahad's. R-1829, R-2325 n.17.  SIU's decision to pay Ahad less due to its failure to properly support her is hardly analogous to broadly-applicable deductions from gross pay like union dues or health benefits.

SIU has abandoned its "authorized deductions" argument, the only issue properly before the Court is whether the ALJ and ARB's use of the Comparators was proper.

### V.    SIU FAILED TO PAY AHAD THE ACTUAL WAGE BECAUSE IT DEPRIVED HER OF OPPORTUNITIES TO EARN COMPENSATION.

Assuming *arguendo* that SIU's new argument is properly before the Court, substantial evidence supports the ALJ and ARB's conclusions that SIU failed to pay Ahad the actual wage.  As both the ALJ and ARB found, while Ahad may have earned less because she generated fewer RVUs,[21] she did so not because of underperformance but because of SIU's own actions.  By repeatedly depriving her of opportunities to earn wages under its compensation system, SIU failed to pay Ahad the actual wage.

SIU argues that it complied with the required wage provisions because it applied the same clinical compensation model to her as it did to all of its physicians.  SIU errs, however, in asserting that Ahad was treated same as others simply because clinical compensation was based on a facially neutral RVU-based system.  "A facially neutral compensation system may still be applied in a discriminatory manner."  *Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1025 (7th Cir. 2011) (reversing Title VII summary judgment where defendant used facially neutral seniority pay system but plaintiffs

---

[21] Defendants note that although they do not dispute that Ahad earned fewer RVUs than others, SIU did not establish what the RVU differential between Ahad and other physicians was, at most eliciting ambiguous testimony from Ahad and Mellinger regarding whether they had "reason to dispute" RVU statistics for one year that were never offered into evidence.  R-1591-92, R-1678.  Likewise, while SIU has argued that Ahad was less productive in part because of vacations, it failed to establish that she took more vacation than others; in fact, Mellinger testified otherwise, and Ahad received a substantial payout for unused vacation upon resignation.  SF 114-118.

claimed service time accrual decisions were made in a discriminatory fashion); *cf. United States. v. Village of Palatine, Ill.*, 37 F.3d 1230, 1234 (7th Cir. 1994) ("A procedure, neutral on its face, may not be applied in a discriminatory manner [under the Fair Housing Act].").  This is what occurred here.

SIU argues that Ahad earned less because she did not perform enough surgeries, did not take trauma call, and declined to take over the breast practice.  But substantial evidence supported the ALJ's finding that "[w]hile SIUSM claims that Dr. Ahad chose not to be productive, the evidence shows that it was SIUSM, [SIUPS], and St. John's Hospital that made [their] own choices that proved to be detrimental to Dr. Ahad enhancing her compensable productivity."  R-1829; *see* R-2325 n.17 (ARB agreeing that Ahad's lower clinical pay was "rooted in detrimental actions taken by the University").  Thus, even though Ahad and the Comparators were subject to the same system, because SIU treated Ahad differently by depriving her of fair opportunities to earn compensation under that system, it failed to pay her "the actual wage level" it paid "to all other individuals with similar experience and qualifications for the specific employment in question."  *See* 65 Fed. Reg. 80110, 80193 (Dec. 20, 2000) ("Whatever factors are used in the employer's actual wage system must be applied to H-1B nonimmigrant workers in the same, nondiscriminatory manner that they are applied to U.S. workers.").

The record is replete with examples of how SIU and its affiliated hospital, St. John's, made it virtually impossible for Ahad to be as "productive" as others.  *See* SF 52-86.  SIU shut down the Comprehensive Obesity Management Program ("COMP") it had

hired Ahad to run, dissolving the positions of two bariatricians and transferring their

non-surgical work to Ahad.  SF 55-59.  There is no evidence that other physicians'

programs suffered similar fates.  SF 57.  SIU did not give Ahad adequate support staff,

providing her with no full-time dietitian and a shared nurse rather than a promised

nurse practitioner, and failing to address constant staff turnover.  SF 60.  SIU and St.

John's failed to market Ahad's practice sufficiently, forcing her to spend time and

resources doing so that she could have spent earning RVUs.  SF 69-72.

     Most notably, SIU and/or St. John's restricted Ahad's access to Medicaid

patients.  SF 61.  Because Ahad's practice relied heavily on such patients, this restriction

"greatly limited [her] patient pool," resulting in a "substantial decline" in her RVUs and

a "direct financial hit."  SF 62-63.  This restriction also made it harder for St. John's to

perform a sufficient number of bariatric procedures to obtain "Center of Excellence"

designation and thereby service Medicare bariatric patients.  SF 64-67.  These limits on

Ahad's ability to service Medicaid and Medicare patients—neither of which was due to

deficiencies in her performance—significantly impacted her ability to earn RVUs.  SF

61-67.  There is no evidence that other physicians at SIU were restricted from seeing

Medicaid patients.  SF 68.

     While SIU argues that Ahad earned less than the Comparators because she did

not take trauma call, substantial evidence supported the ALJ's conclusion that Ahad

only stopped taking trauma call in 2010, after doing so for the previous two years,

because the Department chair asked her to stop doing so.  SF 76-80.[22]  This denied her

an opportunity to earn an additional trauma call stipend and RVUs from procedures on

trauma patients.  SF 80.  Thus, while SIU notes that "every surgeon is offered the

opportunity to be on the trauma call schedule," Pl.'s SF 44, this policy, as applied to

Ahad, was illusory because SIU took that opportunity away from her.  In contrast, there

is no evidence that any of the Comparators were removed from trauma call.  SF 103.

Ahad never declined an opportunity for trauma or general surgery call or to

perform any services for a patient.  SF 51, 83.  Indeed, in addition to her efforts to

compensate for St. John's and SIU's marketing deficiencies by personally conducting

community outreach, SF 70-71, Ahad sought to earn more RVUs by taking general

surgery call and making herself available as a general and foregut surgeon, SF 81, 84.

Unfortunately, her ability to earn additional compensation was limited.  General

surgery call, unlike trauma call, was not compensable with a stipend, and it proved

difficult for Ahad to practice in areas in which other surgeons already were established.

SF 82, 86.

SIU also argues that Ahad's low productivity was self-inflicted because she

declined to take over the breast practice in 2012.  But substantial evidence supported the

ALJ's determination that "for Dr. Ahad to supplement her existing practice or take over

---

[22] SIU argued below that other doctors testified that Ahad never took trauma call, but the ALJ explained why that testimony was equivocal, and instead credited Ahad's consistent testimony that she took trauma call until asked to stop doing so.  R-1826. This Court should not disturb the ALJ's credibility finding "unless the disputed testimony shows on its face that it is beyond credibility," which is not the case here. *First Lakewood Assocs. v. NLRB*, 582 F.2d 416, 420 (7th Cir. 1978).

the breast surgery practice was impractical." R-1831.  Ahad initially declined this offer because it would not have been safe or feasible for her to run the breast and bariatric practices simultaneously.  SF 87-89.  She then declined a suggestion to "kill" the bariatrics program and run the breast practice because she was reluctant to terminate the program on which she had worked assiduously since 2008; because she was only offered the practice on a temporary basis, and afterwards would have been left with no leadership role and less job security; and because she was concerned that leaving bariatrics could jeopardize her visa.  SF 90-91.  SIU's "impractical" offer does not outweigh the numerous ways in which SIU prevented her from earning compensation on par with others.

The ALJ also found that SIU treated Ahad differently regarding maternity leave.  An employer must compensate H-1B workers for maternity leave to the extent required under its benefit plan.  20 C.F.R. 655.731(c)(7)(ii).  SIU's plan provided employees on maternity leave with their entire academic base salary, plus estimated clinical pay for days 31 through 90 up to a maximum of 8 weeks.  SF 111-112.[23]  Ahad took maternity leave for 8 weeks in 2011, with days 23 through 56 occurring during her H-1B status.  SF 13, 110.  While she received her academic base, Ahad received no clinical pay for days 31 through 56 but instead had to give up her entitlement to clinical pay during maternity leave as a condition of her leave being approved.  SF 111, 113.  Ahad's

---

[23] As such, the ALJ concluded that SIU was not required to pay Ahad clinical pay for the first 30 days of her leave.  SF 125-126.

testimony on this point reinforces that although SIU's wage and benefit policies may have been facially uniform, they were not uniformly applied to Ahad.

The undisputed evidence is that Ahad, described in her performance reviews as "fantastic," "excellent," "exemplary," "remarkable," and "unparalleled," was a dedicated and outstanding worker. SF 46-51. She tirelessly strove to build the bariatric program despite a lack of institutional support. SF 55-75. As the ALJ recognized, "it was not that Dr. Ahad was not being productive, working 60 to 80 hours per week, it was that she was not performing enough procedures that generated revenue under the RVU program." R-1832; SF 50. Her supervisors recognized the significant constraints imposed on her practice, and praised her efforts to overcome them. SF 46-49, 72-75. SIU's decision to reward these efforts with substantially lower wages than her colleagues' cannot be characterized as paying her the actual wage it paid to similarly situated employees.

Given that SIU's treatment of Ahad resulted in its failure to pay her the actual wage, the ALJ reasonably calculated the actual wage by averaging the Comparators' wages. SIU's argument that this was prohibited by 20 C.F.R. 655.715, which states that "the actual wage established by the employer is not an average of the wage rates paid to all workers employed in the occupation," Pl.'s Br. 23-24 n.5, is misplaced for two reasons. First, as the ALJ concluded, averaging is permitted as an enforcement measure. R-1825 n.18, *accord* 59 Fed. Reg. 65646, 65655 (Dec. 20, 1994). Further, "occupation" denotes a broader job classification than "specific employment." *See* 20 C.F.R. 655.715 (defining "occupation" as "the occupational or job classification in which

81

the H-1B nonimmigrant is to be employed"); 65 Fed. Reg. at 80193 (distinguishing the two terms and agreeing that "specific employment in question" is relevant for actual wage purposes). Thus, while the regulation prohibits employers from averaging wage rates across broad job categories, it does not prohibit DOL, in an enforcement capacity, from averaging wages among comparators with the same specific employment.

## VI.    DOL'S DECISION IS CONSISTENT WITH LEGISLATIVE INTENT.

The ALJ and ARB decisions are consistent with the intent of the H-1B statute. As an initial matter, the statutory language amply supports requiring SIU to provide Ahad with an opportunity to earn wages on par with the Comparators. *See* 8 U.S.C. 1182(n)(1)(A)(i)(I) (requiring that SIU pay Ahad "the actual wage level" paid to comparators); *see also* 20 C.F.R. 655.731(a)(1) (if there are proper comparators, "the actual wage shall be the amount paid to these other employees").

The legislative history SIU cites is an explanatory document placed into the Congressional Record by one senator after the passage of the 1998 amendments to the INA, not the 1991 bill that enacted the current version of the "actual wage" provision. *See* Pl.'s Br. 24-25; 144 Cong. Rec. S12741-04, S12750, S12753 (Oct. 21, 1998); Pub. L. No. 102-232, § 303, 105 Stat. 1733, 1747 (1991). Additionally, the lengthier excerpts SIU quotes, Pl.'s Br. 25, pertain to benefits, not wages. Finally, while SIU suggests Congress had "educational institutions, like the University, in mind" when drafting the required wage provisions, the subclause concerning educational institutions pertains to a specific wage system not at issue here. *See* 8 U.S.C. 1182(n)(2)(C)(vii)(V) (permitting an annual salary in disbursements over fewer than 12 months). For all of these reasons, this

82

legislative history should be considered cautiously.  *See Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("[S]ubsequent legislative history is a hazardous basis for inferring intent of an earlier Congress.") (internal quotation marks and citation omitted); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 342 (1982) ("[R]eliance on [statement by a single member of Congress] in divining the intent of Congress is an exercise fraught with hazards, and a step to be taken cautiously.") (internal citations and quotation marks omitted); *Lindland v. U.S. Wrestling Ass'n, Inc.*, 227 F.3d 1000, 1008 (7th Cir. 2000) ("Legislative history is a chancy subject; subsequent legislative history is weaker still, indeed is an oxymoron[.]").

In any event, the views expressed in the passages SIU cites support, rather than undermine, DOL's decision.  While the summary document argues that a salary arrangement that applies to U.S. employees and H-1B workers alike "should be treated as presumptively not a violation of [8 U.S.C. 1182(n)(2)(C)(vii)]," it clarifies that such a presumption should apply only "so long as an H-1B worker is not being singled out by such a salary arrangement."  144 Cong. Rec. at S12753.  Here, SIU "singled out" Ahad by depriving her of wage-earning opportunities.  Similarly, the document states that employers "must give H-1B workers in the same categories the same opportunity to earn" performance bonuses.  *Id.*  As described above, while on paper Ahad may have had the same opportunities as others, the reality was very different.

Furthermore, SIU's argument that the ARB's decision undermines legislative intent by placing Ahad on better footing than American workers misunderstands how the required wage provisions operate.  By entitling H-1B workers—but not their

American counterparts—to a required wage, these provisions protect American workers by preventing employers from relying on foreign workers who otherwise might accept less favorable working conditions. *See Eva Kolbusz-Kijne v. Tech. Career Inst.*, 93-LCA-0004, 1994 WL 897284, at *7 (DOL Ofc. Of Admin. Appeals July 18, 1994) (H-1B wage requirements "protect the wages and working conditions of H-1B workers, and thereby, also protect the wages and working conditions of U.S. workers similarly employed"). The risk of losing a qualified, skilled employee would likely deter an employer from treating an American worker as SIU treated Ahad. But many H-1B workers might well tolerate an employer's artificial restrictions on their wage-earning opportunities, given that even lower wages in the United States often exceed potential earnings in their home countries, and given that their lawful status in the United States is tied to their job. Thus, by preventing employers from denying H-1B workers the earnings opportunities available to their similarly situated colleagues, the decision here removes an incentive that otherwise would exist to hire H-1B nonimmigrants rather than American workers.

The result here is also consistent with the restrictions on "benching," which occurs when employers fail to pay an H-1B worker the required wage when the worker is in a nonproductive status. *See* 64 Fed. Reg. 628, 647 (1999). An employer must pay an H-1B worker the required wage for any nonproductive time that is "due to a decision by the employer (based on factors such as lack of work)[.]" 8 U.S.C. 1182(n)(2)(C)(vii)(I-II); *see* 20 C.F.R. 655.731(c)(7)(i). Thus, an employer may not deprive an H-1B nonimmigrant of opportunities to work and then refuse to pay that worker, even if such

nonpayment is permitted in the employee's contract. 65 Fed. Reg. at 80171 ("Nor will

the Department relieve an employer from liability simply because the employee agreed

to periods without pay in the employment contract."); *Kutty,* 2011 WL 3664476, at *9

("Regardless of the private contracts, [the employer] had to pay the "required wage," as

set forth in the INA."). While it is unclear whether Ahad's lack of opportunities for

clinical compensation necessarily amounted to a "benching," these provisions manifest

an intent that employers must either provide H-1B workers with sufficient work

opportunities or pay them what they would have been paid had such opportunities

been provided. Interpreting the statute as permitting SIU to underpay Ahad for a lack

of productivity that resulted from SIU's own decisions to terminate the COMP

program, deny her adequate support staff and marketing, restrict her access to

Medicaid patients, and prevent her from taking trauma call would therefore be in

significant tension with the anti-benching provisions, and such an interpretation should

be rejected. Like the anti-benching provisions, this decision ensures that employers will

"employ fully-qualified [H-1B] workers for whom employment opportunities currently

exist," rather than having workers like Ahad "await work at the employer's choice or

convenience." 59 Fed. Reg. at 65656.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for

summary judgment, deny Plaintiff's motion for summary judgment, and issue an order

dismissing this case with prejudice.

DATED: April 4, 2019                    Respectfully submitted,

                                        /s/ David H. Hoff
                                        David H. Hoff, Bar No. 1234072
                                        Assistant United States Attorney
                                        United States Attorney's Office
                                        201 South Vine Street, Suite 226
                                        Urbana, IL 61802-3369
                                        Telephone 217/373-5875
                                        Fax 217/373-5891
                                        david.hoff@usdoj.gov

                                        Of counsel:
                                        Jennifer S. Brand, Associate Solicitor
                                        Jonathan Kronheim, Counsel for Trial
                                        Litigation
                                        Jesse Z. Grauman,  Senior Attorney
                                        U.S. Department of Labor
                                        Office of the Solicitor
                                        Fair Labor Standards Division
                                        200 Constitution Avenue NW
                                        Room N-2716
                                        Washington, D.C. 20210

                                        *Attorneys for Defendants United States
                                        Department of Labor and R. Alexander
                                        Acosta, in his official capacity as Secretary of
                                        Labor*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was served via this Court's ECF system on this 4th day of April 2019.

<u>s/David H. Hoff</u>
David H. Hoff
Assistant United States Attorney
United States Attorney's Office
201 S. Vine Street, Ste. 226
Urbana, IL 61802-3369
Ph.: 217/373-5875
Fax: 217/373-5891
david.hoff@usdoj.gov